[Civ. No. 5452. First Appellate District, Division One.—April 9, 1927.]

## HAWI MILL AND PLANTATION COMPANY, LIMITED (a Corporation), Respondent, v. THOMAS F. FINN, Sheriff, etc., et al., Appellants.

[1] ESCROW—COMPLETION—PASSING OF TITLE—DATE.—The placing in escrow of papers conveying title does not pass title until the conditions of the escrow are met; but when the escrow is complete, its completion relates back to the date when the papers were placed in escrow.

[2] CONFLICT OF LAWS—FOREIGN LAW—WHEN QUESTION OF FACT.—Where a foreign law is founded on the unwritten law of a foreign country, such as the common law or the civil law, the question is one of fact to be found by the trial court as a fact; and where the question to be determined arises upon the statute law of a foreign country and the statute itself is all that is before the court, the question becomes one of law, but when the construction of the statute is a controversial question which invites the testimony of experts, it likewise becomes a question of fact.

[3] ID.—REPLEVIN—SUFFICIENCY OF WRITING UNDER FOREIGN LAWS—EXPERT EVIDENCE—FINDINGS—APPEAL.—In this action in replevin to recover possession of coffee raised by plaintiff and its assignors, as mortgagees in possession of certain Mexican plantations, the question of ownership and right of possession of said coffee having depended upon the determination of the sufficiency under Mexican law of the consent in writing under which plaintiff and its

---

1. Relation back to first delivery, note, 130 Am. St. Rep. 968. See, also, 10 Cal. Jur. 593; 10 R. C. L. 640. Effect of delivery of deed in escrow as change of title or interest, note, 38 L. R. A. (N. S.) 142. See, also, 10 R. C. L. 635.

2. Proof of foreign law as properly made to court or jury, notes, 7 Ann. Cas. 74; Ann. Cas. 1913D, 256; 34 A. L. R. 1447. See, also, 5 Cal. Jur. 428; 25 R. C. L. 953.

assignors were in possession of said plantations and raised the coffee, the determination of the trial court that said writing was sufficient, based upon the conflicting opinions of expert witnesses, was a finding of fact, conclusive on appeal.

---

(1) 21 C. J., p. 890, n. 67.   (2) 38 Cyc., p. 1524, n. 10, p. 1525, n. 13.   (3) 4 C. J., p. 884, n. 37.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco.   Walter Perry Johnson, Judge.   Affirmed.

The facts are stated in the opinion of the court.

Knight, Boland & Christin for Appellants.

McCutchen, Olney, Mannon & Greene and John F. Cassell for Respondent.

CAMPBELL, J., *pro tem.*—This case involved a dispute over 3,975 bags of coffee, worth about $74,382, grown on nine fincas or coffee plantations in the state of Chiapas, Mexico, during the winter of 1920–1921, and brought to San Francisco in April and May, 1921.

When the coffee arrived in San Francisco it was attached and taken from the possession of respondent by the appellant Thomas F. Finn, the Sheriff of the City and County of San Francisco, under writs of attachment in an action commenced by the appellant Geo. A. Moore & Co. on April 26, 1921, entitled "*Geo. A. Moore & Co., a Corporation, Plaintiff,* vs. *Hidalgo Plantation & Commercial Company, La Zacualpa Plantation & Harrison Company, Defendants.*"

Respondent filed a third-party claim; the appellant Geo. A. Moore & Co. gave the statutory bond to the appellant Sheriff, and the latter refused to deliver back the coffee to respondent.

Thereupon respondent commenced the present action in replevin against the appellants Geo. A. Moore & Co., Sheriff Finn and the surety on the latter's official bond, to recover possession of the coffee.

The trial court found in favor of the respondent; found that respondent owned and was entitled to the possession of the coffee; that neither the appellant Geo. A. Moore & Co.

nor its attachment debtors, who were defendants in the attachment action, had any ownership or right to possession of the coffee, and entered judgment accordingly. All of the defendants have appealed from these judgments.

The respondent is a corporation in possession and operating some nine fincas or coffee plantations in Mexico. The coffee which is the subject of the controversy was raised by the respondent and another corporation known as the Chiapas Coffee Company on these plantations. The respondent, however, is the successor of that company, taking over all its rights.

There were a number of questions involved and decided by the trial court, but there is one which is determinative of the case and that is as to the ownership of the coffee. The question of ownership depends upon whether under the Mexican law a mortgagee in the occupancy of real property and cultivating it with the knowledge and consent of the mortgagor is the owner of the crop he raises. The plaintiff in this case was the mortgagee of the plantations upon which this coffee was raised. It and its assignor, Chiapas Coffee Company, were in possession and cultivating them with the knowledge and consent of the mortgagors, and the coffee involved here was part of a crop so raised. The two corporations which were indebted to the appellant Geo. A. Moore & Co. and as whose property the coffee was attached were mortgagors.

The two corporations which the appellant claims are the real owners of the coffee are two California corporations organized by a man named Harrison some time prior to 1908. They were organized by him for the purpose of acquiring and operating plantations in Mexico, and he has always been their president and general manager. These two corporations purchased some nine fincas or plantations in Mexico. The Mexican law, however, prohibited a foreign corporation from holding the legal title to land within a certain distance from the coast, and the fincas involved were within this distance. To avoid the prohibition the legal title to the fincas was taken in two so-called sociedad collectivos or partnerships formed under the Mexican law and constituting each of one of the California corporations and Harrison.

For the purpose of raising funds the California corporations issued a large number of what are called "acre certifi-

cates." The certificates specify on their face that the owner thereof is entitled to so many shares not of stock in the company, but in the coffee and rubber plantations belonging to the company. The by-laws provide that each share represents one acre in these plantations. The certificates also specify that in consideration of the payment to the corporation of $400 per share the corporation will plant one acre for each share and harvest and cultivate the same for a certain length of time and the owner of the certificate will be entitled to the profit from the crop grown. The shares or acre certificates so sold called for an acreage nearly equal to the total acreage of the plantations.

In 1908 one of the collectivos or partnerships, together with the California corporation and Harrison, who composed it, executed a mortgage on the fincas which belonged to that particular collectivo in favor of a firm known as Sigmund Robinow & Son, and in 1912 the other collectivo or partnership, together with the California corporation and Harrison, who composed it, executed a mortgage on the plantations which belonged to it in favor of two men by the names of Revuelto and Braun. Later, in 1913, Revuelto acquired by assignment all the rights under the 1908 mortgage in favor of Sigmund Robinow & Son. The situation then after 1913 was that there were two mortgages outstanding on the plantations executed both by the collectivos and by the California corporations and that these two mortgages were owned by Revuelto and by Revuelto and Braun.

Financial difficulties came upon Harrison and his two companies, and proceedings for the foreclosure of the two mortgages were commenced. In 1914 a stipulation in writing was made in the foreclosure proceedings by the mortgagees on the one side and the two collectivos or partnerships on the other together with Harrison and his two corporations. This stipulation recited that there was urgent need for further funds to operate the plantations and realize upon their crops and that the only person disposed to advance the necessary funds was Revuelto, one of the mortgagees, who would do so on condition that he be repaid out of the first fruits of the plantations and that he and Braun, the other mortgagee, be authorized to superintend and control the application of the moneys. The stipulation then asked that the court ap-

prove the arrangement agreed upon and the court made its order doing so.

It does not appear with certainty whether or not Revuelto entered into actual possession of the plantations at this time. It does appear, however, that he advanced very considerable sums under the arrangement, which, as has been said, entitled him to repayment out of the first fruits of the plantations. It also appears that neither these advances nor the mortgages have ever been repaid and that the plaintiff succeeded to all the rights of Revuelto and Braun. The plantations continued to be operated under the arrangement mentioned until 1916. At that time, if not before, Revuelto, the mortgagee, entered into the occupancy of the plantations and this with the knowledge and consent of the mortgagors. Revuelto and after his death his estate remained in possession of the plantations, operating them and cultivating and harvesting their crops until the spring of 1917. At that time Chiapas Coffee Company purchased the mortgages from the Revuelto estate and Braun and purchased also the credits for the moneys advanced by Revuelto and his estate for carrying on the plantations pursuant to the arrangements detailed. The Chiapas Coffee Company remained in occupancy similarly operating the plantations until January, 1921. At that time it transferred all its rights to the respondent, and the respondent took possession and has been in possession ever since.

It is evident that the acre certificate holders supplied the money with which Harrison's two companies operated and were the parties chiefly interested beneficially through the companies. The two companies getting into financial difficulties, the certificate holders organized themselves into a corporation for their own protection. This corporation was called the Chiapas Coffee Company. The mortgages and claims of Revuelto and Braun were, of course, superior to the rights of the certificate holders, and foreclosure being threatened and in fact commenced, the certificate holders undertook to purchase and finally did purchase those mortgages and claims, paying therefor something in excess of $250,000. This was done in 1917. When the Chiapas Coffee Company purchased the mortgages it was part of the arrangement that the possession of the plantations should be turned over to the Chiapas Company, and this was done.

The arrangement for the purchase of the mortgages by the Chiapas Company and its taking over of possession of the properties was the result of negotiations covering a considerable period of time, to which Harrison, representing himself, his two companies and the two collectivos holding the legal title, was party, and the arrangement made was made with their consent. This is evidenced by two writings appearing in the record, one a letter written by Mr. Harrison to a Mr. W. H. McInerney, who represented the acre certificate holders, dated October 5, 1916, and reading as follows:

''In reply to your letter of even date, and in accordance with a conversation had with you this morning, I wish to confirm the statements made to you at that time, in substance as follows: I will agree to sign a Deed of Transfer of all the coffee properties in the State of Chiapas, Mexico, or all properties, wherever situated, belonging to the certificate holders of the Hidalgo Plantation & Commercial Company, and the certificate holders of the Las Zacualpa Plantation Company and or Hidalgo Plantation & Commercial Company and La Zacualpa Plantation Company, at any time such a document is prepared, subject, of course, to the mortgages outstanding against these properties in the names of Messrs. Revuelto and Braun, Mr. W. S. Fisher and Mr. Jose Revuelto.''

The other is a cable which Harrison sent to one Manuel Gris, the attorney in fact of himself and his California corporations in Mexico. The cable is dated February 5, 1917, and reads:

''Business Revuelto Braun finally concluded. Turnover to Graham Ker absolute control properties covered by Revuelto Braun mortgage.''

The Graham Ker mentioned in the cable was the agent of the Chiapas Coffee Company in Mexico and the plantations were turned over to him by the Revuelto estate pursuant to the purchase of the Revuelto and Braun claims and mortgages and with the consent of Harrison and his companies, as indicated in the letter and cable.

That the Chiapas Company purchased the two mortgages in 1917 is not strictly accurate in one sense. The arrangement for the purchase was made in 1917, and the occupancy of the plantations was taken by the Chiapas Company at that time. The full purchase price of the mortgages, how-

ever, was not paid, but only a part, and the papers were placed in escrow against payment in full. Such payment in full was later made and the terms of the escrow met.

Appellants contend that the conveyance of the mortgages was not complete until the final payment made in June and July, 1921, respectively, and the mortgages which had been held in escrow delivered, and that therefore title did not pass until such delivery and consequently neither respondent nor its predecessor was a mortgagee in possession at the time of the harvesting of the crop nor at the time of the levy of the attachment, and cites us to *Whitney* v. *Sherman,* 178 Cal. 435 [173 Pac. 931]. **[1]** The case cited merely holds that no title passes until the condition of the escrow is so far performed that the grantee is entitled to the possession of the deed; that as the escrow was abandoned, the deed was not delivered pursuant to the escrow instructions, and it therefore became effective only at the time of the delivery. While that is true, it is likewise the rule that when the escrow is complete its completion relates back to the date when the papers were placed in escrow (*McDonald* v. *Huff,* 77 Cal. 279 [19 Pac. 499]; *Marr* v. *Rhodes,* 131 Cal. 270 [63 Pac. 364]), so that in all legal effect the Chiapas Company in 1917 both acquired the mortgages and took possession then, which the mortgagees previously had.

From 1917, when the possession was taken by the Chiapas Coffee Company, all of the money which went into the upkeep and operation of the plantations, including the entire expense of producing and marketing the coffee here involved, was paid by the Chiapas Coffee Company or by respondent. The appellant Geo. A. Moore & Co., on the other hand, claims as a creditor of the collectivos upon an unsecured indebtedness which arose prior to February, 1914. As the coffee attached would not have been produced but for the financing of the plantations of the Chiapas Coffee Company and respondent, the equities of the case are with respondent.

The main question in the case is the construction of certain Mexican statutes. As appellants express it in their brief: "As we view it, the point involved is really very narrow and very simple, though at first, by reason of the long history, seems complex. It is, whether under the laws of Mexico one who is in physical occupation of land, without claim or right of title, becomes the owner of coffee grown on the land."

The Mexican statute applicable to the controversy here presented is the chapter on "Accession," containing a number of articles. The articles pertinent to the case are as follows:

"Article 773. The ownership of properties gives a right to all which they produce or which is united or incorporated with them naturally or artificially. This right is called 'accession.'

"Article 789. He who builds, plants or sows in bad faith on the land of another shall lose what is built, planted or sown, without having the right to claim any indemnification from the owner of the soil, or of retaining the thing.

"Article 792. It is understood that there is bad faith on the part of the builder, planter or sower, when he makes the planting or sowing, or permits, without reclamation that another may do so, with his material on land which he knows is another's, without previously asking the owner for his consent in writing."

The question as to the sufficiency of the consent in writing under article 792 contained in the letter written by O. H. Harrison to W. H. McInerney, who represented the acre certificate holders, and the cable sent by Harrison to Manuel Gris, the attorney in fact of himself and his California corporations in Mexico, to turn over absolute control to Graham Ker (the agent of the Chiapas Coffee Company) of the properties covered by Revuelto and Braun's mortgage, is attacked by appellants. [2] Appellants contend that under the principles of law the construction of this "Title on Accession" is for the court, while respondent contends the determination of a foreign law is a fact for the jury, or for the court, if a jury is waived, which, under a conflict of the evidence, will not be disturbed on appeal.

Numerous authorities have been cited from other jurisdictions, but none from this state. These authorities do not seem to be entirely in accord; however, the authorities seem to agree, at least to the extent that where a foreign law is founded on the unwritten law of a foreign country, such as the common law or the civil law, the question is regarded as one of fact to be found by the trial court as a fact, and where the question to be determined arises upon the statute law of a foreign country and the statute itself is all that is before the court, the question becomes one of law. But

when the construction of the statute is a controversial question, as it is in this case, which invites the testimony of experts, it likewise becomes a question of fact.

Appellants criticise the consent in writing, claiming that it is not sufficient, that it does not describe what is to be done under it, etc. If, as appellants contend, the construction of this section is purely a question of law, could this court with the section only before it and without reading anything into it hold that the consent means a formal document containing some particular phraseology descriptive of what is to be done under it, or would it not be a more reasonable construction to hold that the section requires merely a writing signed by the party to be charged and that the right of the planter, grower, and cultivator to the crop cannot be acquired through a mere oral agreement?

The question as to the character of the written consent required, being the main controverted question in the case, it became necessary to determine the issue. This could be done only by determining the construction placed on the statute by the judicial opinions of the courts of Mexico or by the testimony of experts learned in the law of that country. There being no judicial opinions or decisions and the issue being submitted on the testimony of experts, the question became one of fact. It is not necessary to review the authorities cited as the question here involved has been passed upon in *Compania Trans. de Petrolia* v. *Mexican Gulf Oil Co.*, 292 Fed. 846, decided since the instant case was tried, which case is the latest judicial expression on the question and involves the construction of a Mexican statute. In that case the court says:

"Beginning with *The Amelia, sub nom. Talbot* v. *Seeman*, 1 Cranch, 1 and 38, 2 L. Ed. 15, the law has been as stated by Chief Justice Marshall:

" 'That the laws of a foreign nation, designed only for the direction of its own affairs, are not to be noticed by the courts of other countries, unless proved as facts, . . . cannot be questioned.'

"We had occasion recently in an admiralty case to restate this now settled principle, and to cite some well-known authorities, *Taya's Sons Co. of New Orleans* v. *Compania Arrendataria*, (C. C. C.), 280 Fed. 825. See, also, *Hudson River Pulp & Paper Co.* v. *Warner*, 99 Fed. 187, 188 [39

C. C. A. 452]; *The Asiatic Prince,* 108 Fed. 287, 289 [47 C. C. A. 325]. In 10 Ruling Case Law, 'Evidence,' 319 (cf. *Bank of China* v. *Morse,* 168 N. Y. 458 [85 Am. St. Rep. 676, 56 L. R. A. 139, 61 N. E. 774]), it is stated:

" 'There is some controversy whether the proof of foreign laws should be addressed to the court or the jury. It involves, however, no serious conflict and depends entirely upon the form in which the foreign law is presented. Although what the foreign law is, is usually denominated a question of fact, yet, when it merely involves the construction of a written statute or the interpretation of judicial opinions, it becomes a question of law.'

"We need not pause, however, to mark the line between court and jury in a case confronting the trial court, because here, where the construction of Vera Cruz statutes was a *controversial question below, which invited the testimony of experts, the judgment of the court determined as a fact* (italics ours)—(*Hanley* v. *Donoghue,* 116 U. S. 1 [29 L. Ed. 535, 6 Sup. Ct. Rep. 242, see, also, Rose's U. S. Notes], *Chicago & Alton R. R.* v. *Wiggins Ferry Co.,* 119 U. S. 615, 622 [30 L. Ed. 519, 7 Sup. Ct. Rep. 398])—that plaintiffs were the owners of the oil on its being reduced to possession and had a cause of action for the value of the oil taken by the trespasser."

[3] In the instant case three experts were called as witnesses to testify as to whether or not the cable from Harrison constituted a sufficient consent in writing under the Mexican law of "Accession." Mr. Verna Estanol, called by respondent, testified that under article 792 all that is necessary is that the consent is in writing, "but there is no special formality attached thereto," and with reference to the cable sent by Harrison to Manuel Gris, the attorney in fact of himself and his California corporations in Mexico, that such cable "is a consent in writing as required by article 792"; that if an American corporation should be in the actual physical occupancy of some coffee plantations in the state of Chiapas in Mexico and paid all the expenses of planting, cultivating, harvesting, and marketing the coffee from those plantations and the person or persons in whom the legal title is vested knows of all the circumstances, it would have been acting in good faith according to the Mexican law, because

it had been acting with the knowledge and consent of the other party, the owner of the land.

Mr. Estanol further testified that the requirement of the "consent in writing" prescribed in article 792 does not apply at all in a controversy other than one between the parties themselves—between the owner of the land and the cultivator of the crop; that the lack of consent in writing only makes a contract void in disputes between the parties, and, further, under the Mexican law, when a transaction has become fully executed, the requirement of a written contract or other writing evidencing the transaction possesses no further materiality, and so, of course, if this construction of the statute be correct, and written consent under the circumstances here presented is not required, article 3194 of the Mexican Civil Code requiring contracts affecting the possession of immovable property to be registered has no application.

Mr. Arturo Guajardo and Mr. Manuel G. Salinas, called by appellants, testified to a contrary construction of the statute. The trial court, however, on this conflict in the evidence found for respondent, and such finding, being a finding of fact, will not be disturbed on appeal.

In view of the foregoing, discussion of the remaining points presented would be academic.

The judgment is affirmed.

Tyler, P. J., and Cashin, J., concurred.