[Civ. No. 8336. First Appellate District, Division One.—May 25, 1932.]

In the Matter of the Estate of MANGLE MINTHORNE TOMPKINS, Deceased. BEATRICE M. TOMPKINS, as Executrix, etc., Appellant, v. PHILIP W. TOMPKINS et al., Trustees, etc., Respondents.

Walter E. Dorn for Appellant.

Keyes & Erskine for Respondents.

JOHNSON, J., *pro tem.*—This is an appeal by Beatrice M. Tompkins, widow of Mangle Minthorne Tompkins, from the decree of final distribution of the estate of the decedent, wherein certain property, which is claimed by the widow to have been community property of the marriage, was adjudged to be separate property, and as such was distributed to the respondents as trustees, pursuant to certain provisions in the will of the deceased creating a trust, under which the widow is one of the beneficiaries.

The appellant makes some minor specifications of error which will be noticed later, but the chief question concerns the true character of the property in controversy.

The widow was duly appointed as executrix of the will, which was admitted to probate on August 25, 1928; and on December 27, 1929, she filed her account, together with a petition for final distribution. In the petition she averred that certain of the personal property of the estate, comprising enumerated stocks and bonds in addition to a sum of money, constituted community property of the marriage; and she prayed that one-half thereof be distributed to her individually. Objections both to the account and the petition were filed by the trustees named in the will, and in due time the account was settled. The hearing of the petition was postponed, however, from time to time, and after the settlement of a second account, the court on October 27, 1930, made its findings, in which it found that the property in dispute and all other property of the estate was the separate property of the deceased; and in accordance with such findings, final distribution was thereupon made to the trustees as provided in the will. Under the terms of the trust the widow and the son of the deceased are the chief beneficiaries.

The widow bases her asserted community right upon two grounds: one, the legal presumption attaching to property acquired during marriage; the other, an alleged verbal agreement effecting a conversion of separate property of the spouses into community property. It is contended that upon both grounds the evidence entitled the widow to findings and decree in her favor.

The issue was largely one of fact for the determination of the trial court; and in so far as there was substantial and credible evidence sufficiently clear and convincing to the mind of the trial judge to lead to the conclusion that the property was in fact separate property of the deceased, the court's decision upon the facts cannot be made the subject of review, even though there was also evidence to the contrary.

It can hardly be gainsaid that the evidence as a whole is sufficient to support a finding that the property in dispute represents property acquired by the decedent by gifts or inheritance from his parents.

Mr. and Mrs. Tompkins were married on July 15, 1911. At that time neither of them appears to have had any substantial possessions. Mr. Tompkins was then employed by the Montebello Oil Company in Ventura County. Before he married, he had been earning between $75 and $90 a month besides his board; and after the marriage his pay was from $100 to $140, less a charge of $15 for rent of a cottage. He remained with the oil company until about August, 1912, when he and his wife took up their residence in San Francisco. After a period of unemployment, during which he received an allowance of $75 a month from his mother, Mr. Tompkins became associated in 1914 with the Golden Gate Music Company, both as an employee and a stockholder. His original investment in stock of the company was in the amount of $3,000 furnished by his mother, and his salary began at $100 a month. His connection with the company continued from 1914 until his death on July 16, 1928. By March, 1917, his salary had increased by stages to $150 a month, and later this amount was increased to $300 a month, which was paid from January 1, 1919, to December 31, 1921, and thereafter he received $350 a month to the time of his death. As a stockholder in the company, his holdings increased from 503 shares on December 1, 1915,

to 1495 shares on November 4, 1916; and these shares he continued to hold until January, 1920, at which time he gave 1468 shares to his wife, leaving himself the owner of only 27 shares during the rest of his life. The total dividends received by Mr. Tompkins from 1915 to the time of his death amounted to $11,465.70, or an average of approximately $900 a year.

Prior to the death of his mother in 1918, Mr. Tompkins appears to have had no other sources of income than those mentioned, together with certain property received as gifts from his mother; and the widow testified that throughout the period of his connection with the Golden Gate Music Company the family's living expenses were about $300 a month except toward the end of Mr. Tompkins' life, when the expenses ran as high as $450 a month.

The mother's estate, in which Mr. Tompkins shared, was distributed on April 19, 1919; and the father having died later, Mr. Tompkins shared also in the distribution of the father's estate under a decree made on May 27, 1921. Besides property acquired under the will of his mother, Mr. Tompkins had received as gifts from her in her lifetime a fifth interest in a piece of real property in San Francisco and a fifth interest in certain stocks and bonds. The property derived by Mr. Tompkins from his parents was substantial in character and value, as appears from the schedules before the court, and was productive of income.

The evidence indicates that Mr. Tompkins did not speculate, and that while from time to time there were changes in the securities owned by him, such changes were brought about for the most part by purchase of new securities with the proceeds of sale of securities previously held. He had kept a record of his business transactions in a book admittedly in the possession of the widow after his death, which, however, she declared herself unable to produce at the trial. If that book had been available, the detailed dealings might have been readily followed.

After the death of his parents, Mr. Tompkins acquired property in San Rafael on which he built a home. The land with the improvements and furnishings cost about $30,000; and the financing was done in large part with borrowed money. The widow testified that these loans were paid, so far as she knew, out of Mr. Tompkins' earnings,

but that when he died there was $6,000 still due the Humboldt Bank on the house. This property was deeded to Mrs. Tompkins March 24, 1924, and was not part of the estate. It is a fair inference that the living expenses and payments made on loans must at least have equaled the earnings of Mr. Tompkins from 1914 to the time of his death. ▉ And unless the contrary is made to appear, the law presumes that money used in the maintenance of the family is drawn from community funds before there is encroachment on separate property. (*Estate of Cudworth*, 133 Cal. 462, 468 [65 Pac. 1041]; *Estate of Grannis*, 142 Cal. 1, 6 [75 Pac. 324]; *Thompson* v. *Davis*, 172 Cal. 491, 495 [157 Pac. 595]; *Title Ins. & T. Co.* v. *Ingersoll*, 158 Cal. 474, 492 [111 Pac. 360]; *Van Camp* v. *Van Camp*, 53 Cal. App. 17, 25 [199 Pac. 885].) The same presumption attaches to payment of loans obtained on personal credit. It seems probable, however, that some of the income from the inherited property was devoted to repaying money borrowed from time to time.

In the briefs filed on behalf of the widow much insistence is laid on the presumption that property acquired during marriage is community property, and that the burden of overcoming that presumption rests upon those contending otherwise. In this connection it is urged that the evidence is insufficient in probative force to overbear the presumption. ▉ The law demands for the purpose clear and convincing evidence; but it must be remembered that the weight and credibility of the testimony are to be gauged by the trial court. If, upon an analysis of evidence of substantial character, in the light of the established rules, the mind of the trial judge, exercising reasonable discrimination, is satisfied that the naked presumption in favor of community property has been outweighed, then the findings of the trial court must prevail. (*Estate of Nickson*, 187 Cal. 603, 606 [203 Pac. 106].)

▉ It is contended, however, by the widow that it devolved upon the trustees, asserting all the property left by the deceased to be his separate estate, to identify positively each item either as property inherited in specie from one of the parents or acquired with the avails thereof. But there is no absolute requirement of such precise identification. Proof should consist of the best evidence reasonably

obtainable, but the law does not exact the impossible; and it must be remembered that the widow had been in possession of her husband's records after his death, but testified that they had been lost in some way. Circumstantial as well as direct evidence is receivable, and legal proof is that made by a preponderance of the evidence under all the facts and circumstances as presented in each individual case. Upon the submission of the controversy, it is then for the court to draw its reasonable inferences from all the evidence adduced, bearing in mind the rule that to dissipate the naked legal presumption in behalf of the community right, there need be exhibited only "such legal evidence as, under all the circumstances of the particular case, would ordinarily produce conviction in an unprejudiced mind" (*Freese* v. *Hibernia S. & L. Soc.*, 139 Cal. 392, 395 [73 Pac. 172, 173]; Ballinger on Community Property, sec. 167) ; or as otherwise expressed, "such proof as would so convince the mind of the ordinary practical every-day man that he would be willing to act upon it in the business affairs of life". (McKay on Community Property, sec. 221; *Estate of Nickson, supra; Estate of Pepper,* 158 Cal. 619, 622 [31 L. R. A. (N. S.) 1092, 112 Pac. 62]; *Freese* v. *Hibernia S. & L. Soc., supra; Stewart* v. *Stewart,* 113 Cal. App. 334 [298 Pac. 83].)

While we have not recited the substance of all the testimony given, and have omitted reference to some which the widow regards as favorable to herself, we have no hesitancy in saying that in our opinion there was sufficient evidence to justify a conclusion that the property left by Mr. Tompkins represented property acquired by gift or inheritance from his parents.

■ Irrespective, however, of the source of the property, the widow bases her claim also on a verbal agreement, which she said was made between herself and Mr. Tompkins before their marriage. On this subject she testified: "Mr. Tompkins said at the time we were married he did not have very much money at that time, but he expected during his lifetime to get money from his mother and father, and that would be community property. It would be as much mine as his."

There is evidence that at various times bank accounts in the name of Mr. Tompkins were changed to joint accounts

of himself and wife, and that he gave her the stock of the Music Company and the San Rafael home. On the other hand, his will operates as a declaration on his part that his property was his to dispose of in his discretion, and in the assertion of testamentary power over "all the property real and personal" owned at the time of his death, he created a trust for the benefit of his wife and his son. The testimony of Mrs. Tompkins, which was not without inconsistencies, was, therefore, to be weighed against the will itself, and against all the other facts and circumstances in evidence.

■ The general rule, that the uncontradicted testimony of a witness to a particular fact is not to be disregarded, has its exceptions. There are modes of impeachment other than by direct contradiction, such as the manner and motives of the witness, faultiness of memory, indefiniteness and evasiveness of answers on cross-examination, inconsistent conduct of the parties, and adverse independent facts and circumstances. (*Davis* v. *Judson,* 159 Cal. 121, 128 [113 Pac. 147]; *Blanc* v. *Connor,* 167 Cal. 719, 722, 723 [141 Pac. 217]; *Caldwell* v. *Weiner,* 203 Cal. 543, 546 [264 Pac. 1100]; *Michener* v. *Hutton,* 203 Cal. 604, 612 [59 A. L.·R. 480, 265 Pac. 238]; *Staples* v. *Hawthorne,* 208 Cal. 578, 583, 584 [283 Pac. 67]; *First Nat. Bank* v. *Shipley,* 109 Cal. App. 194, 200 [292 Pac. 996]; *Cowan* v. *Hill,* 109 Cal. App. 656, 659 [293 Pac. 871]; *Younger* v. *Younger,* 112 Cal. App. 445, 447 [296 Pac. 1104].)

The weight and credit to be given to the testimony on this point as upon others was within the province of the trial judge; and this court would not be justified in giving credence to testimony which he rejected, unless the record were such as to establish certitude beyond peradventure.

To our minds the evidence as a whole supports the findings of the trial court, declaring all the property of the estate to have been separate property of the deceased.

■ Regarding the evidence, it is contended that the court erred in admitting testimony of the mode of life of Mr. and Mrs. Tompkins during his employment in Ventura County, likewise of loans made to Mr. Tompkins by his mother after he moved to San Francisco, and also testimony concerning the cost of the San Rafael home and the gift of that property to Mrs. Tompkins. Since the character of the

property acquired by Mr. Tompkins was brought into issue, and he was not able to speak for himself, it was proper to address inquiry to the situation of the parties at the time of their marriage, and to ascertain by what means the family expenses were met as the years passed. It was proper to show, also, that it was not until after the death of the parents of Mr. Tompkins that an expensive home was acquired; and just as Mrs. Tompkins herself introduced evidence of transfers of bank deposits from individual accounts of the husband to joint accounts of the spouses, so the trustees were entitled to show a gift of the home to the wife, in support of an inference opposed to Mrs. Tompkins' testimony concerning a prenuptial agreement of common ownership.

Error is assigned further because of the admission of the decree of distribution of the estate of Mr. Tompkins' mother without pointing out what portion of his share remained as property of Mr. Tompkins himself when he died. The evidence shows that among other things upward of $30,000 in money came to Mr. Tompkins from the sale of certain real property which had belonged to the mother; and what has been said on the subject of tracing mutations is a sufficient answer to the criticism expressed. We find nothing in the record justifying any complaint.

The decree of final distribution is affirmed.

Knight, Acting P. J., and Cashin, J., concurred.