[Civ. No. 19002. Second Dist., Div. Two. Dec. 5, 1952.]

ARTHUR E. LOGAN, Appellant, v. LORRAINE FORSTER et al., Respondents.

B. R. Ware for Appellant.

Alfred S. Chapman and Wallace & Cashin for Respondents.

FOX, J.—Plaintiff filed this action against the executrices of his late wife's estate alleging that one half of all the properties comprising the estate belonged to him as his share of the community property. The total appraised value of the

estate was $364,382.54. Plaintiff appeals from the judgment that there was no community property.

Plaintiff and the decedent were twice married and lived together more than 20 years. The first marriage took place in Ventura County on December 8, 1923, at which time Mrs. Logan was a widow about 51 years of age and plaintiff was her junior by 19 years. She had inherited from A. J. Flores, her first husband, and at the time of her marriage to plaintiff was the owner of all the stock in a Mexican corporation which owned and operated a power and light business located in Mexicali, Baja California, Mexico. On the date of the marriage plaintiff was employed at a bank and earned a salary of $135 a month, while his wife's income from her stock ownership in the utility company was approximately $3,000 per month. Mrs. Logan also owned a house in Los Angeles which she had inherited from Mr. Flores and in which she was residing when she died. At the time of her death she also owned or had an interest in certain real property in Los Angeles County, all of which she had inherited from her mother with the exception of property located in South Pasadena, which she purchased during her marriage and which was conveyed to her by an instrument describing her as a married woman.

Prior to Mrs. Logan's first marriage in 1923, the Mexican utility company had been small, not too efficiently operated, and plagued by a degree of corrupt practices, waste and incompetence by certain of its employees. In 1921 Mrs. Logan employed her nephew, Mr. Chapman, and sent him to Mexicali to rectify these conditions. In subsequent years, with the installation of an improved organization under the direction of Mr. Chapman, who became manager and treasurer of the company, coupled with the growth and expansion of the city of Mexicali, the company began to prosper through the increased sale of electricity. In 1924 plaintiff and Mrs. Logan interrupted their European honeymoon to return to Mexico in order to obtain a new franchise after the old one had been cancelled. In March, 1925, Mr. Chapman resigned as manager of the utility company, after the company had shown a net profit of over $140,000 in the last three years of his tenure, whereupon Mrs. Logan became president, general manager and treasurer of the company. She retained those offices until the assets of the business were sold in 1943.

In 1925 Mrs. Logan purchased a residence in Mexicali and thereafter, until the sale of her business, resided there about

eight months of each year, spending the summer months annually in her Los Angeles home. During the 20 years following Mr. Chapman's resignation the utility company was put in charge, successively, of three Mexican managers, who handled the entire business operation. Plaintiff testified that these managers and Mrs. Logan's Mexican attorney, Mr. Barcenas, were in frequent telephonic communication with Mrs. Logan, held conferences with her from time to time about business transactions, and visited her house several times weekly as dinner guests where company affairs were discussed. Plaintiff further testified that Mrs. Logan was furnished daily reports concerning collections, disbursements and bank deposits. Mrs. Logan received no specified salary but made periodic withdrawals between 1937 and 1944 totaling $40,697 which were attributed to salary and reported as such to the Mexicali office of the Baja California Treasury Department.

The record is replete with oral and documentary testimony regarding the financial history and vicissitudes of the utility company. By 1928 the entire plant and operating system had been rebuilt, part of it with funds advanced by Mrs. Logan. In 1927, in addition to the 100 shares outstanding, 900 more shares were issued to Mrs. Logan, adding 450,000 pesos in capitalization. At that time, 300,000 pesos were charged to surplus and 50,000 pesos to the new franchise, while the remaining 100,000 pesos were charged to surplus in 1940. During the period 1932 to 1935, and again in 1938, the business operated at a loss. Between 1937 and the ultimate sale of the business in 1943 the financial statements of the company indicate a steady increase in the value of the physical plant largely due to a reinvestment in capital equipment of about 180,000 pesos. Between 1937 (the date of the second marriage) and 1944 Mrs. Logan received as dividends and salaries from the business about $88,000, of which $47,808 was denominated dividends and $40,697 as salary.

In 1929 Mrs. Logan became a Mexican citizen, and retained her Mexican nationality until she died. Plaintiff testified that her naturalization was undertaken on the advice of Mr. Barcenas, to avoid the impact of laws restricting the ownership of Mexican land by aliens and requiring governmental approval for the operation of a domestic industry by foreigners. Plaintiff testified that Mr. Barcenas counseled that Mrs. Logan should keep her own property in her separate name and should not engage any foreigners as employees or directors of her

company. The record shows clearly that Mr. Logan, who is an American citizen, was never officially connected with the company nor did he ever receive any salary from it and that the Logans at all times scrupulously kept their properties separate and apart. However, plaintiff testified that he assisted his wife in many ways in connection with the business operations, such as checking reports, participating in business conferences, and making purchases of materials, as well as representing her interests during a period of political turmoil and labor unrest.

In 1934 Mr. and Mrs. Logan parted after a period of domestic infelicities during which time Mrs. Logan commenced an action for divorce in Los Angeles County, which was later dismissed because she was not a resident there. On November 26, 1934, a separation agreement was executed between the parties, in which the salient terms provided that: (1) All property of every kind standing in the name of either party and all property subsequently to be acquired was to be the separate property of such party; (2) Mrs. Logan was to pay $10,000 to plaintiff in settlement of all claims, including any for services and in lieu of support of plaintiff for the rest of his life; (3) there never had been any community property belonging to the parties and all property held by Mrs. Logan and its increments were her separate estate; (4) the parties waived alimony, court costs and counsel fees and right to support in any pending or future action; (5) plaintiff was to leave the house in which he resided with Mrs. Logan and the parties would henceforth live apart. On the date of the execution of their agreement Mrs. Logan paid Mr. Logan the $10,000 and he executed a grant deed conveying to Mrs. Logan title to all real and personal property standing in her name or possessed by her both in California and Mexico.

On September 9, 1935, Mrs. Logan procured a default divorce in Nogales, State of Sonora, Mexico, on the grounds of cruelty. The husband failed to appear, having been served by publication. Although the complaint contained an allegation that there was no community property, the prayer asked only for dissolution of the marriage and restoration of her maiden name and the decree of divorce made no adjudication of property rights. Mr. Logan testified that he had no knowledge of the pendency of the divorce action, and learned of the divorce for the first time in November of 1937, when Mrs. Logan asked him to accompany her to Mexico City to obtain an increase in utility rates. On their way to Mexico City they

remarried, on November 20, 1937, in El Paso, Texas. This marriage was not recorded in Mexico. Mr. Leonardo Sosa, an attorney, called as an expert on Mexican law, testified that where a marriage of a Mexican citizen and a foreigner was not registered the Mexican system of community property would not operate, so that the separate property of each remained separate, and profits and rents from property owned by one spouse, as well as income earned by a spouse, remained separate property. Immediately following the marriage, the spouses returned to Mexicali where they made their permanent residence until 1943.

At the time of the second marriage Mrs. Logan was about 68 years old, and by 1943 was in poor health and a partial invalid. Throughout the course of the second marriage the spouses continued to keep their respective properties separate and there was a meticulous effort made to avoid any commingling of funds. Mrs. Logan maintained her own bank account free of any intervention or control on plaintiff's part. She paid out of funds under her control the entire expense of the upkeep of the homes in Mexicali and Los Angeles. Whenever plaintiff made any expenditures for Mrs. Logan or for household expenses, he presented bills or receipts to Mrs. Logan and was reimbursed. Plaintiff even filed a claim against Mrs. Logan's estate for reimbursement for the payment of certain of her debts. The expenses of trips together, the entertainment of friends, and theatre or dinner parties, were borne by Mrs. Logan. Plaintiff appears not to have had any independent occupation of his own, except for the intermittent receipt of commissions on real estate sales. He had a small amount of real property which he handled himself and a bank account to which Mrs. Logan had no access. He testified that he kept his affairs separate from those of his wife.

Plaintiff and Mrs. Logan filed separate income tax returns. The managers of the utility company were under instructions to take no orders or directions from Mr. Logan in matters concerning the conduct of the business.

In 1943 the utility company sold its physical assets for $187,588.18, which price included the electrical system, real estate in Mexicali, a substation in Calexico, and supplies on hand. The proceeds of this sale, together with other funds of the company, were subsequently deposited in a bank account in Mrs. Logan's name in Calexico, California. In February, 1945, this account totaled approximately $224,-

000 and is the major asset in Mrs. Logan's estate. Following the sale of the business, Mrs. Logan and plaintiff moved to California where they resided up to the time of Mrs. Logan's death.

The record presents no clear-cut picture as to the exact amount disbursed by Mrs. Logan for living expenses, although it suggests that before 1944 Mrs. Logan traveled considerably between Mexico and the United States, maintained two homes, and enjoyed a generous scale of living. Between 1944 and her death in 1949 she withdrew from a bank account $60,-125 to meet her needs, but an unascertained part of this was devoted to gifts to charities and relatives. However, at least $500 per month was definitely applied to living expenses, and plaintiff, in conformity with the practice of Mrs. Logan's unquestioned management and use of property standing in her name, made no objection to Mrs. Logan's disposition of the money. Mrs. Logan died in May, 1949, leaving an estate consisting of four bank accounts aggregating $257,609.49, the sum of $1,250 in traveler's checks, the real property previously described appraised at $40,000, stock in both the Security-First National Bank and Bank of America valued at $46,194.05, jewelry worth $13,029, and a promissory note, an automobile, and furniture collectively worth about $5,500. It may be noted that when the second marriage occurred Mrs. Logan owned virtually all of the real property, the jewelry, the household furniture, the utility company stock and all the bank stock except the Bank of America stock appraised at $5,009.05. These securities and the other items were acquired by Mrs. Logan from funds in her possession, ownership and control. In a holographic will dated November 22, 1946, Mrs. Logan declared all this property to be part of her separate estate, devising and bequeathing it to her nieces and nephews, with no provision made for plaintiff. That will, and two earlier witnessed wills, one executed in 1925 and the other undated but revoked in 1934, were received in evidence over plaintiff's objection.

In reaching its conclusion that no part of the property included in decedent's estate could be attributed to the community, the court made extremely detailed, extensive, often confusing and occasionally ambiguous findings of fact. Since plaintiff's principal attack on the judgment is predicated on his contention that certain of these findings are unsupported by the evidence and contrary to law, we will consider them

first. Plaintiff asserts that the court's determination that there was no community property belonging to the spouses at the time of the Mexican divorce is based on the court's erroneous interpretation of the effect of the Mexican decree, and its adoption of such decree as an adjudication of the property rights of the parties. ■ However, an examination of all the findings shows that the court did not rely on the Mexican decree, since this did not purport to determine or adjudicate the interests of the spouses in the property. This question was open for adjudication in the proper forum. (*DeYoung* v. *DeYoung,* 27 Cal.2d 521 [165 P.2d 457]), and the court in the case at bar made its own finding "that there were no properties or goods belonging to said parties which could be considered belonging to the marriage state at that time," which was the time of the divorce. This independent determination of the court below is plainly based on the property settlement agreement executed by the parties in November, 1934, in contemplation of their separation, and which was valid and subsisting at the time of the divorce ten months later. (Civ. Code, § 159; *Adams* v. *Adams,* 29 Cal.2d 621 [177 P.2d 265].) Plaintiff did not challenge the agreement, leaving the court free to determine, as it did, that it was a complete and valid settlement of the property rights of the parties at the time of the divorce. There is thus no question that all the property owned by Mrs. Logan at the time of her remarriage to plaintiff was her separate property (Civ. Code, § 162), since plaintiff, by virtue of the property settlement agreement, had relinquished to her any interest therein which he might have had.

Plaintiff attacks the finding of the court that the failure of the parties to record their second marriage in the civil register of marriages in Mexico, as required by the Mexican civil code relating to marriages of a Mexican citizen to a foreigner, obviated the need for applying the Mexican system of community or conjugal partnership property to the subsequent accumulations and acquisitions of the spouses. This finding was based on expert testimony as to the import and effect of the law of Mexico and as such was a question of fact for the trial court. (*Wickersham* v. *Johnston,* 104 Cal. 407 [38 P. 89, 43 Am.St.Rep. 118].) ■ Where the meaning of the statutory law of a foreign country is in controversy and its elucidation requires expert testimony, the resolution of such conflict as to the meaning and effect of the foreign law remains a question to be determined by the trier

of the facts (*Hawi Mill & Plantation Co., Ltd.* v. *Finn*, 82 Cal.App. 255, 263-264 [255 P. 543]) and such determination, if supported by substantial evidence, will not be disturbed on appeal. (*Estate of Johnson*, 100 Cal.App.2d 73, 80 [223 P.2d 105].) The testimony of Mr. Sosa provides ample support for the court's finding that under the law of Mexico plaintiff's separate property at the time of her remarriage in 1937 and all property which she subsequently acquired was her separate property.

Plaintiff further argues that the law of Mexico is inapplicable since he was a California domiciliary during the time of the second marriage when such property was acquired and the law of the husband's domicile at the time of acquisition determines the status of personalty as being separate or community property. While the court made no express finding as to the matrimonial domicile, it is apparent from an analysis of all the findings that the court proceeded on the assumption that plaintiff went to Mexicali for the purpose of establishing his home for an indefinite period at the site of his wife's business, which was also the locus where the spouses actually resided for the next several years, and such a finding with respect to plaintiff's domicile is necessarily implied by the findings made. (*Shepard* v. *Yale*, 94 Cal.App. 104, 107-108 [270 P. 742]; *Wolvin* v. *First Methodist Episcopal Church*, 111 Cal.App. 643 [295 P. 1085].) ██ "Where an omitted finding must be inferred from a consideration of the findings actually made, an appellate court will recognize the necessary inference and consider the finding in question as having in effect been made (citing cases)." (*Schultz* v. *Los Angeles Dons, Inc.*, 107 Cal.App. 2d 718, 725 [238 P.2d 73].) ██ Plaintiff cannot successfully complain of the court's failure to find on this issue when, in the light of the evidence and the reasonable inferences therefrom, the facts actually found and the judgment ordered, the finding would have been adverse to him. (*Walpole* v. *Pre-Fab Mfg. Co.*, 103 Cal.App.2d 472, 481 [230 P.2d 36].)

██ It is thus clear that plaintiff's interest, if any, in Mrs. Logan's estate, which the court properly found to be her separate property at the time the parties became domiciled in California in 1943, must derive from the operation of section 201.5 of the Probate Code, which provides in part: "Upon the death of either husband or wife one-half of all personal property, wherever situated, heretofore or here-

after acquired after marriage by either husband or wife, or both, while domiciled elsewhere, which would not have been the separate property of either if acquired while domiciled in this state, shall belong to the surviving spouse; . . .'' It may be remarked that this statute does not purport to affect vested property rights in marital property owned by a husband and wife brought into this state concomitant with a change of domicile to California. (*In re Miller*, 31 Cal.2d 191, 196 [187 P.2d 722].) ▮ It is rather, a succession statute, speaking as of the time of death, and governing the rights of testamentary disposition and succession enacted under the state's power to regulate the descent of or succession to, property within its borders. (*In re Miller, supra*, 196-197; *Irving Trust Co.* v. *Day*, 314 U.S. 556, 562 [62 S.Ct. 398, 86 L.Ed. 452, 137 A.L.R. 1093].)

In contending that the court erred in its application of the California law to the property rights of a husband in the accumulations of a wife derived from her operation of a business which is originally her separate property, plaintiff argues that various findings made by the court, to the effect that the property settlement agreement remained in full force and effect throughout the second marriage and controlled the status of all acquisitions by the parties subsequent thereto, are in conflict with the governing decisions. Relying on *Barham* v. *Barham*, 33 Cal.2d 416 [202 P.2d 289], and *Mundt* v. *Connecticut Gen. Life Ins. Co.*, 35 Cal.App.2d 416 [95 P.2d 966], he argues that the executory provisions of a property settlement agreement are abrogated by a re-marriage of the parties; and that in any event the agreement which was an integrated bargain containing inseparable provisions that the parties shall live separate and apart and be relieved of their reciprocal duties to support each other regardless of their marital relations, is unenforceable as against public policy and an invalid attempt to alter the normal incidents of marriage. (Civ. Code, § 159; *Pereira* v. *Pereira*, 156 Cal. 1 [103 P. 488, 134 Am.St.Rep. 107, 23 L.R.A.N.S. 880].) Assuming but without deciding that this case comes within such rule, the simple answer to plaintiff is that having by his acts and conduct permitted title to the property in dispute to vest in his wife by his observance of the contract, and being *in pari delicto* in the alleged illegality by his complete acquiescence in its full execution, he is not now entitled to receive the aid of the courts in

598

recovering the property relinquished to the wife under the contract he now stigmatizes as against public policy. (*Brooks v. Brooks*, 63 Cal.App.2d 671, 676 [147 P.2d 417].) ▪ "Ordinarily the parties to a contract, void because contrary to public policy, will be left where they are, when they come to the court for relief (citing cases)." (*Stanley* v. *Robert S. Odell and Co.*, 97 Cal.App.2d 521, 531 [218 P.2d 162].) On this principle alone the judgment might be affirmed. However, we do not deem it necessary to determine the cogency of these arguments, since, in the view we take, the issue of whether any part of Mrs. Logan's estate consisted of community property is fully decided by other findings of the court adverse to plaintiff's claim.

The court found that at the time of the second marriage the utility business belonged to Mrs. Logan as her separate property; that its increased value at the time of the sale of its assets resulted primarily from the growth of the population and improvement in the economic conditions in Mexicali; that none of the income or profits of the business were attributable to the energy, ability or industry of Mrs. Logan; that the dividends she received from the earnings and income of the company did not exceed a reasonable rate of return and interest on the value of the stock; that all the moneys received by Mrs. Logan as salary were used and consumed by her in meeting the living expenses of the spouses; and that all the assets included in Mrs. Logan's estate were either acquired by her before her second marriage or from the proceeds of her separate property. Plaintiff attacks these findings by taking the position that all but the 10 per cent of the stock in the Mexican company which Mrs. Logan owned in 1923 is community property, so that 90 per cent of the proceeds derived from the sale of the utility company must be classified as community property. He also contends that all the profits, accretions, and enhancement in value of the utility company during the period of both marriages is directly attributable to the skill, capacity, and personal initiative of Mrs. Logan and therefore belong to the community. Both arguments are untenable and unjustified under the circumstances of this case.

It is manifest that by virtue of the property settlement contract agreed to by the parties, Mrs. Logan was recognized as the sole owner of the Mexican company and of the stock therein, so that at the time of her second marriage this was her separate property. ▪ It is the general rule that the

rents, issues and profits obtained from the separate property of one spouse are invested with the same character as the property which produced it. (*Boyd* v. *Oser*, 23 Cal.2d 613, 621 [145 P.2d 312].) However, where such separate property is a business whose continued success and lucrativeness after the marriage depend on the contribution of the toil and talents of the husband or wife, then that portion of the increment, profits, or returns attributable to his or her labor is normally community property. (3 Cal.Jur. 10-Yr.Supp., Community Property, § 46, p. 534.) ▉ Where, as in the case at bar, a wife owns a utility enterprise at the time of her marriage which she continues to operate thereafter, the question of what portion of the profits and enhancement in value of the business is to be allocated to the personal ability, initiative and industry of the wife and classed as community property is a question of fact turning on the circumstances of each individual case. (*Estate of Gold,* 170 Cal. 621, 623 [151 P. 12].) In making such apportionment between separate and community property our courts have developed no precise criterion or fixed standard, but have endeavored to adopt that yardstick which is most appropriate and equitable in a particular situation (*Todd* v. *McColgan,* 89 Cal.App.2d 509, 513 [201 P.2d 414]), depending on whether the character of the capital investment in the separate property or the personal activity, ability, and capacity of the spouse is the chief contributing factor in the realization of income and profits. (*Estate of Gold, supra.*) Two diverse methods of apportionment have been developed. In *Pereira* v. *Pereira,* 156 Cal. 1 [103 P. 488, 134 Am.St.Rep. 107, 23 L.R.A.N.S. 880], the husband was actively engaged in conducting a business which was his separate property and worth $15,000 at the time of the marriage. When the marriage was dissolved its value had increased to $70,000. The court held that the husband's separate property amounted to his original investment plus a fair return thereon measured by the usual interest on a long investment well secured, which was fixed at 7 per cent. The increment being attributable to the personal efforts of the husband, belonged to the community estate. This rule was followed in *McDuff* v. *McDuff,* 48 Cal.App. 175 [191 P. 957]; *Estate of Caswell,* 105 Cal.App. 475 [288 P. 102]; *Estate of Fellows,* 106 Cal.App. 681 [289 P. 887] and kindred cases. Another approach to this problem in harmony with the principle of apportionment in fixing the character of

property acquired in the conduct of a business belonging to one spouse is taken in the case of *Van Camp* v. *Van Camp,* 53 Cal.App. 17 [199 P. 885]. There the husband at the time of the marriage was the controlling stockholder and manager of a corporation by which he continued to be employed after his marriage. He received a salary plus expenses for performing his managerial duties, but his principal income was derived from dividends on the stock he held. In an action for divorce the wife urged that the dividends as well as the salary were community property, since they were produced by the husband's personal capacity and industry. The court found that the husband's salary was commensurate with his labor for the corporation and this was an adequate return to the community.

The recent tendency of the cases is to undertake an equitable apportionment of the income from a business between community and separate property "in accordance with the extent to which it is allocable to the husband's efforts or his capital investment." (*Huber* v. *Huber,* 27 Cal. 2d 784, 792 [167 P.2d 708].) In applying this principle of apportionment the court is not bound either to adopt a predetermined percentage as a fair return on business capital which is separate property nor need it limit the community interest only to the salary fixed as the reward for a spouse's service but may select whatever formula will achieve substantial justice between the parties (*Todd* v. *McColgan, supra,* pp. 513-514.)

It is primarily a question of fact "for the court to determine what portion of the profits thereafter arises from the use of this (separate) capital and what part arises from the activity and personal ability of the husband." (*Witaschek* v.*Witaschek,* 56 Cal.App.2d 277, 281 [132 P.2d 600].) An examination of the record convinces us that the inferences drawn and conclusions reached by the court are supported by the evidence. By 1937 the utility company had been a going business for over 25 years and its books showed a generally favorable balance after 1924. It had long outgrown its period of inefficiency and had become stabilized in its administrative and organizational operations. Between 1937 and 1943 the net worth of the business increased from 956,499 pesos to 1,195,185 pesos, an augmentation of 238,985 pesos. During the same period dividends were paid to Mrs. Logan in the sum of 239,040 pesos. Thus, translating these gains over a six-year period into their approximate equivalent in

dollars, the value of the business, whose assets were worth about $250,000 at the time of the marriage, were enhanced in value about $50,000 at the time of the sale, while Mrs. Logan received $47,808 in dividends on her stock. Considering the evidence that there was a gradual expansion in the physical size of the city of Mexicali, and in its economic development, that Mrs. Logan was 68 years old at her marriage and 74 years old when the business was sold, that the business was run by its Mexican managers, that Mrs. Logan had no office at the business, visited the plant only at sporadic intervals, spent most of her time at home or in traveling, made no significant decisions affecting the business, and was content with the continuation of the routine which had long been established, the court properly found that the enhancement in the physical value and the amount of profits earned was essentially an enhancement characteristic of a capital investment in a stable and flourishing business. (*Van Camp* v. *Van Camp, supra.*) That the dividends paid were a reasonable return on her investment is equally supportable, ". . . it is not the profits of the business, but only the ascertained earnings of the defendant from his individual efforts in managing, laboring on, or caring for such property, in the nature of salary, wages or the equivalent thereof, which would be community property (citing cases)." (*Cozzi* v. *Cozzi,* 81 Cal. App.2d 229, 232 [183 P.2d 739].) That decedent's participation in the business from 1937 to 1943 was not responsible for its success, its increased value or its profits is reasonably to be inferred from the record. The court was therefore entitled to conclude that the sum of $40,697 drawn by Mrs. Logan as her salary during this time was all that could be attributed to the community and adequately compensated the community for the efforts she expended, in view of the advanced stage of development to which the business had been brought prior to her second marriage. (*Van Camp* v. *Van Camp, supra; Gump* v. *Commissioner of Internal Revenue,* 124 F.2d 540, 543.)

Without embarking on a comprehensive recapitulation of the evidence regarding the style of living of the spouses, it is patent that the court's determination that all salaries received by Mrs. Logan were disbursed to meet living expenses is amply sustained by clear and convincing evidence. (*Estate of Tompkins,* 123 Cal. 670, 675 [11 P.2d 886]; *Estate of Ades,* 81 Cal.App.2d 334, 338 [184 P.2d 1].) Unless the contrary is shown, "the law presumes that money used in

the maintenance of the family is drawn from community funds before there is encroachment on separate property.'' (*Estate of Tompkins, supra*; *Estate of Cudworth*, 133 Cal. 462, 468 [65 P. 1041].) Since this was the sole item which could be classed as community property, and since the record shows that from the time of the sale of her business to 1949, when she had no independent earnings, she spend $60,125 to support the family as well as in making gifts to which plaintiff did not object, the court could well presume that all community funds were exhausted, and that indeed her separate corpus had been encroached upon. ■■■ Since the other property in Mrs. Logan's estate consisted of property purchased with the proceeds of separate property, such evidence was ''as effective to prove that all assets of the estate are separate property as a specific showing from which separate source each asset flowed.'' (*Estate of Ades, supra*, p. 339.)

■■■ Plaintiff next argues that the court erred in admitting into evidence Mrs. Logan's wills and in making a finding that her last will contained a declaration that all property that she possessed was separate property. Although such evidence was inadmissible as proof of the character of the property in question its admission was not prejudicial in view of the other decisive evidence on this point. (*Potter* v. *Smith*, 48 Cal.App. 162, 169-170 [191 P. 1023].) ■■■ Likewise, the incorporation of such a declaration in the findings is not prejudicial where the judgment does not rest upon that particular finding for its validity. (*American Nat. Bank* v. *Donnellan*, 170 Cal. 9, 15 [148 P. 188, Ann.Cas. 1917C 744].)

■■■ If one finding, sustained by sufficient evidence, will support the trial court's judgment, as to the findings before referred to in the present case, an appellate court will presume that the judgment was predicated on such finding, and questions relative to other findings become immaterial upon appeal and may be disregarded. (*American Nat. Bank* v. *Donnellan, supra*; *Mershon Co.* v. *Pachmayr*, 88 Cal.App.2d 901, 904 [199 P.2d 687].)

There is ample evidence to support the essential findings on which the judgment is based.

Judgment affirmed.

Moore, P. J., and McComb, J., concurred.

A petition for a rehearing was denied December 23, 1952, and appellant's petition for a hearing by the Supreme Court was denied February 2, 1953.