[Civ. No. 13994.  First Dist., Div. One.  Nov. 7, 1949.]

LAWRENCE ZOTTARELLI et al., Appellants, v. PACIFIC STATES SAVINGS AND LOAN COMPANY et al., Respondents.

Cushing, Cullinan, Trowbridge, Duniway & Gorrill, Wood, Crump, Rogers & Arndt, Guy Richards Crump, and Ralph W. Evans for Appellants.

Fred N. Howser, Attorney General, Herbert E. Wenig, Deputy Attorney General, Sullivan, Roche, Johnson & Farraher, Hanna & Morton, Gardiner Johnson, Roy D. Reese and Albert A. Rosenshine for Respondents.

BRAY, J.—In an action brought by plaintiffs as a class action in behalf of all creditors similarly situated, the court rendered judgment in favor of defendants. Plaintiffs appeal.

## CONTENTIONS

The question to be determined is the validity of assignments made by certain certificate holders in defendant Pacific States.[1] Plaintiffs contend these assignments are void and should be set aside because of (1) alleged breach of trust by defendant commissioner; (2) violation by the corporate defendants of a duty owed a fellow beneficiary and of an implied contract that nothing would be done to deprive claimants wrongfully of their rights.

## FACTS

Although the reporter's transcript is 2,682 pages long (the briefs total 1,104 pages plus 94 pages of appendices), there is very little conflict on the facts. The conflict is on the inferences, deductions and legal conclusions to be drawn from them.

Plaintiffs and the class they represent were, and it is contended now are, investment certificate holders in Pacific States. They number about 26,730, and the original face amount of their claims aggregated about $24,595,210.97. Guaranty owns all of the outstanding stock of both Pacific States and Auxiliary.

Pacific States was incorporated as a building and loan association in 1899 and continued to do business until its seizure by the then Building and Loan Commissioner on March 4, 1939. At this time, as held in *Pacific States Sav. & L. Co.* v. *Hise*, 25 Cal.2d 822 [155 P.2d 809, 158 A.L.R. 955], Pacific States was insolvent, its assets being impaired to the extent of over $10,000,000, without considering its liabilities to its investors. (Hise case, p. 832.) Although started in 1939, the Hise case was not finally determined until January, 1945, when the United States Supreme Court refused to take juris-

---

[1] Defendant Pacific States Savings and Loan Company will herein be referred to as Pacific States; defendant State Guaranty Corporation as Guaranty; defendant Pacific States Auxiliary Corporation as Auxiliary.

diction following the action of the California Supreme Court upholding the decision of the superior court to the effect that the seizure was justified. During the period of this litigation the successive commissioners were not free to sell the assets of the company, which consisted of real estate. Title insurance companies would not issue policies without quitclaim deeds from Pacific States and Guaranty. Robert S. Odell was the chief spokesman for all of the corporations and generally was unwilling to supply quitclaims unless the commissioners would accept surrender of certificate holders' claims instead of cash for the purchase price of the real property sold.

Defendant Mortimer became commissioner in January, 1943. From the initial seizure in 1939 up to the time of the assignments hereinafter mentioned, all necessary procedural steps had been taken by the various commissioners in the liquidation proceedings. Notice to creditors had been given, claims approved, and some rejected. Liquidating dividends had been declared and paid totaling 37½ per cent of the face amount of the claims, and it was expected that further liquidating dividends of 10 per cent each would be paid on November 1, 1945, and February 1, 1946. (These were paid to the then holders of uncancelled claims.) In 1939, the then commissioner, although he believed Pacific States to be insolvent, accrued interest on investment certificates, and he and his successor commissioners did likewise yearly thereafter. This interest varied from 2 per cent the first year, 1½ per cent the next three years, to 3 per cent the last three years.

After the Hise case was ended, defendant commissioner made a number of sales without certificate claims being involved. These sales were approved by the superior court, but Pacific States appealed from the court orders approving the sales. This delayed their completion for an indefinite period.

Shortly after defendant commissioner took office he was sought out by Odell for conferences designed to break the existing deadlock with respect to the sale of assets, and to discuss other matters, such as a pending assessment suit against Guaranty, and proposed legislation applying to Pacific States. Throughout subsequent meetings the two men developed hostile and antagonistic attitudes towards each other. Odell wanted the commissioner to drop the assessment suit, to take in claims on sales of assets and to sell only certain undesirable properties.

On September 11, 1944, a long hearing was held before Judge Robinson, both Odell and the commissioner being repre-

sented by counsel. Judge Robinson met alternately with each side, trying to find possible points of agreement. Finally, agreement was reached on a number of issues, and, with respect to sales of assets, Judge Robinson announced that the commissioner had agreed to take in claims for one-third of the price, valuing such claims at the court's valuation of 60 per cent of the original principal amount. (There was still unpaid 82½ per cent of the original principal amount, so that the 60 per cent surrender value was a discount.) The commissioner at this time apparently did not believe the claims would ever be paid off 100 per cent on the principal. In July of 1943 he had written to all claimants as follows, in part: "If the assets are sold and the proceeds distributed to you by the State, it is estimated that your recovery will be at least 60 per cent or 70 per cent in addition to the 17½ per cent already paid."

At the conclusion of the September 11, 1944, meeting, Judge Robinson also announced that Odell agreed to furnish the required quitclaim deeds to all sales. Judge Robinson stated that the commissioner believed claimants should ultimately receive interest, that the courts should decide the proper rate, and that the commissioner would not later argue for or against a rate of 7 per cent.

Thereafter, some sales were carried out in accordance with this agreement. Whenever claims were surrendered on sales, either before or after September 11, 1944, the books of Pacific States showed a reduction of certificate liability equal to the remaining principal amount of the particular claim, and a reduction of the accrued interest liability equal to the amount of interest which would have been accrued on that claim at the "commissioner's rates."

In 1943, section 16.04 of the Building and Loan Association Act was adopted, through the efforts of Odell. This section provides in general that investment certificate holders in associations whose assets are held by the commissioner, together with unsecured creditors, can petition the court and withdraw assets to themselves. When a group holds 25 per cent of the certificates it can withdraw 25 per cent of the assets, and subsequent withdrawals of 10 per cent may be made thereafter. Early in 1945 Odell began negotiating with banks to raise money to purchase certificates and was threatening the commissioner with withdrawals of assets.

Due principally to the war, the real estate market had boomed, the value of the Pacific States assets had increased

materially, and by the middle of 1945 it began to appear from the court's appraisal that, unless there was a change for the worse in the real estate market, the assets of Pacific States should bring sufficient prices, if sold, at least to pay in full the principal of all claims.

The court, in determining values for surrender of certificates in purchase of property, at one time had fixed the value of certificates as 50 cents on the dollar, at another as 60 cents on the dollar. The claims used at that time were mostly those purchased on the open market and for which the seller received no more than the amounts set by the court. None of the Odell group were purchasers of property at this time.

Early in 1945 the commissioner received an over-all bid in the sum of approximately 20 million dollars for all of the remaining assets excepting only certain cash on hand. In May he submitted the bid to the court without recommendation as to its acceptance. The court appointed its own appraiser of the assets. The hearing was continued from time to time, and finally heard on October 15.

In conferences between Odell and the commissioner within the two days preceding the hearing of October 15, and on that day in the judge's chambers, an understanding was reached by which certificates would be valued at 100 cents on the dollar, would be accepted by the commissioner, and their acceptance authorized by the court, on sales for all or most of the purchase price. This agreement was put into definite form. It was understood that a corporation known as the Robert S. Odell Company would borrow money from banks, which money would be used to purchase investment certificates at a price to equal the unpaid principal (that is, 100 cents on the dollar, less the amount of the liquidating dividends theretofore paid). These certificates were to be pledged with the bank as collateral security for the loans, Odell company would advance this money so borrowed to Auxiliary, which would make the offers to purchase and would purchase the certificates. Then Auxiliary for a consideration of $100 would assign to Guaranty all rights to receive interest on the purchased certificates. Auxiliary would assign the purchased certificates to the bank, but would advise the bank that it had assigned to Guaranty the contingent interest on the certificates. The way the plan would work was this: A purchaser of a parcel of real property, upon his bid being approved by the court, would deposit in cash the amount of his bid in escrow with instructions to purchase from Auxiliary certifi-

cates for the unpaid principal amount, the contingent interest portion of these certificates having already been assigned to Guaranty. Then upon receipt of a deed from the commissioner, such certificates would be surrendered to the commissioner in payment of the purchase price of the property sold. The commissioner then would reduce on the Pacific States books the remaining principal amount of the particular certificates surrendered. Guaranty, which would now own the right to the interest, if any, on said certificates, would donate to Pacific States the interest portion of the certificates. This method was arrived at to avoid income taxes, as a gift to the company of indebtedness to a stockholder was not taxable income. The effect of this plan was that a certificate holder received the balance of principal, but no interest, both the principal and interest liability was written off on the Pacific States books, although it had only paid for the principal, and the stockholder of Pacific States, to wit, Guaranty, in effect would eventually receive the benefit of the nonpayment of interest to the certificate holders. All appeals by Odell and his corporations were to be dismissed and all controversies between him and the commissioner ended by this agreement. The commissioner went with Odell to the Wells Fargo Bank, the American Trust Company, and the Bank of America, and told officials of each, in effect, that he would go along with the plan.

Loans were obtained from which certificates were bought and used in the payment of the purchase price of assets under the above plan. Odell prepared a letter to go with an assignment form to each stockholder. This letter he submitted to the commissioner, who would neither approve nor disapprove it. On October 25, the letter was sent out, offering to purchase certificates at an amount equal to the full remaining principal balance of each certificate. It then said: "Interest, if any, on claims is payable only after complete payment of principal to all claimants, and the interest heretofore declared by the Building and Loan Commissioner is disputed and in controversy. If you want the full amount of your investment now, without awaiting further liquidating dividends and the final adjudication of the interest controversy, you should sign and date the enclosed assignment and send it to the undersigned." Three other letters were sent out by Auxiliary, all of which presented a discouraging picture as to the possibility of holders ever receiving any interest on their claims. · Between that date and March 1, 1946, most of the certificate holders

in whose behalf plaintiffs sue assigned their certificates. On February 28, 1946, the commissioner sent out a letter to the certificate holders in which he stated that the court's appraisal of October 10, 1945, showed that the assets were valued at an amount sufficient to pay not only the full face amount of each claim, but such interest as might thereafter be determined, and called attention to the fact that a suit had been filed in behalf of claimants seeking to establish 7 per cent as the interest which should be paid. From then on, there were very few, if any, assignments of certificates. The certificate holders who had not assigned their certificates eventually received the full balance of principal and a sum equal to interest as set up by the commissioner on the company books. This sum was paid by Pacific States as a compromise of the interest claims of the certificate holders, after it regained possession in 1946 of the remaining assets.

## DUTY OF THE COMMISSIONER

Before detailing the commissioner's acts, let us see what his legal duty was towards the certificate holders. This duty is set forth in *Evans* v. *Superior Court,* 14 Cal.2d 563 [96 P.2d 107], where the court was considering the status of one of the commissioner's predecessors with reference to the liquidation of this very company. The court said (p. 573): ". . . it appears appropriate to consider the status of the commissioner upon taking possession and throughout liquidation. During such time, the commissioner has the status of a trustee of a trust in private property, or in other words, the status of a trustee of a private trust. As was said in *Richardson* v. *Superior Court,* 138 Cal.App. 389, at page 394 [32 P.2d 405], 'While it thus appears that the authority of the commissioner over the property and business affairs of the association when in his custody is subject to certain prescribed judicial review and control, the principal characteristics of his position as administrator are those of a public officer charged with a statutory duty which, for reasons of public policy, has been made to include a trust in private property.' " Section 170 of the Restatement, Trusts (vol. 1) says: "(1) The trustee is under a duty to the beneficiary to administer the trust solely in the interest of the beneficiary." Section 172 provides: "The trustee is under a duty to the beneficiary to keep and render clear and accurate accounts with respect to the administration of the trust." Comment (d) to section 173 is as follows: "Ordinarily the

trustee is not under a duty to the beneficiary to furnish information to him in the absence of a request for such information. . . . Even if the trustee is not dealing with the beneficiary on the trustee's own account, he is under a duty to communicate to the beneficiary material facts affecting the interest of the beneficiary which he knows the beneficiary does not know and which the beneficiary needs to know for his protection in dealing with a third person with respect to his interest. Thus, if the beneficiary is about to sell his interest under the trust to a third person and the trustee knows that the beneficiary is ignorant of facts known to the trustee which make the interest of the beneficiary much more valuable than the beneficiary believes it to be, the trustee is under a duty to the beneficiary to inform him of such facts.''

The commissioner here was taking part in the over-all transaction. He agreed in advance that he would accept certificates on sales, he allowed Odell to get the names and balances from the books, he verified the signatures and amounts on assigned claims, and he carried out his promise to accept certificates. He knew that Auxiliary was soliciting assignments of claims, including interest rights. He saw in advance the letter to be sent claimants. It would seem difficult for a court of equity to say that the commissioner was not taking part in the transactions.

Plaintiffs contend that the commissioner violated his duty as trustee in two respects: (1) that his agreement to accept surrender of certificates from which the interest rights had been separated for the purchase of assets, was in fraud of the rights of the certificate holders; (2) that he failed to disclose properly and completely to the certificate holders the facts known to him, and should have advised them not to dispose of their certificates. Defendants other than the commissioner contend that the certificate holders in no event would have been entitled to interest, and hence having received 100 per cent of the principal, have nothing about which they are legally entitled to complain.

1. INTEREST.

█ The first question to be redetermined is whether in the liquidation of a building and loan association its investment certificate holders would be entitled to interest, if and when, after payment of principal, there should be assets from which interest could be paid. The contract with each holder provided for interest ''at such rate as shall be determined by the Board

of Directors of the Association.'' After seizure, no rate was determined by the board. The right to interest in the liquidation of a bank by the depositors in the commercial as well as in the savings department of a bank, where the California Bank Act was silent on the subject, was determined in the case of *Greva* v. *Rainey,* 2 Cal.2d 338 [41 P.2d 328]. By analogy, that case, as to the right to interest, is controlling here. In *In re Pacific Coast Bldg.-Loan Assn.,* 15 Cal.2d 134 [99 P.2d 251], the court approved the holding in the Greva case, saying (pp. 146-147) : ''The statute expressly places the investment certificate holders in a more favorable position than the membership shareholders; . . . The law gives preference in the matter of payment of the claim, which, reasonably interpreted, means the principal sum due; and this claim has already been satisfied in full. As to interest the statute is silent. And, in view of that silence, the statutory preference should logically end at that point, and the problem must then be solved in accordance with the usual equitable principle governing liquidation, namely, the principle of equality among creditors. Stated broadly, the rule is that one creditor is not entitled to payment of interest on his claim in receivership, bankruptcy, or other form of liquidation, *after* the commencement thereof, where the assets are not sufficient to pay the principal of all claims in full. (See *Greva* v. *Rainey,* 2 Cal.2d 338 [41 P.2d 328] : Glenn on Liquidation, secs. 488, 510.)

''The above rule was announced by this court recently, upon a full review of the authorities, in *Greva* v. *Rainey, supra.* A bank was in liquidation and the respective rights of stockholders and various depositors were involved. This court held first that the depositors, as creditors, were entitled to payment of not only the principal of their claims but interest during liquidation, before any payments should be made to stockholders. This distinction between the rights of creditors and stockholders is well settled, and as applied to the present case, would mean that any of the various kinds of creditors of the association would be entitled to interest as against the guarantee stockholders.'' (See, also, *People* v. *California etc. Trust Co.,* 34 Cal.App. 269 [167 P. 181], and *Allen* v. *California Mutual B. & L. Assn.,* 22 Cal.2d 474, 490 [139 P.2d 321].)

2. DID THE COMMISSIONER VIOLATE HIS TRUST IN APPROVING THE CERTIFICATE SURRENDER PLAN?

The trial court held that he did not. To upset this holding we must find, as matter of law, that the trust was

violated. Taking all the circumstances as they appeared to the commissioner at the time, we cannot say that the commissioner violated any duty to the certificate holders in approving the plan. It must be remembered that ever since the original seizure in 1939 successive commissioners had been obstructed in their attempted liquidation of the affairs of the company by the Odell group by lawsuits and other methods. There were 61 separate appeals pending from attempted sales which had been approved by the court. The title companies refused to issue title insurance policies without quitclaims from Odell and his companies. Question was raised as to whether, even if the assets should prove sufficient, the commissioner could pay interest and if so, in what amount, and Odell refused to give these quitclaims unless the right to interest on the certificate claims should be separated from the right to principal, and the interest right assigned to Guaranty, and his plan agreed to. Also, while the then appraisements showed that the assets were enough to pay principal and probably to pay interest, if it legally could be paid, such result depended upon the real estate market not changing for the worse. How steady the market was, was a matter of conjecture. The plan suggested would end all litigation and controversy, would enable those holders who desired to do so, to get their principal now without further delay and without uncertainty. Nearly six years had elapsed since the seizure of the company. With the 10 per cent to be paid on November 1, only 47½ per cent would have been paid in liquidating dividends. Certificates were being sold on the street in large quantities and were being transferred on the books of the company. Odell was continuing his efforts to regain the properties and to force the commissioner to accept certificates instead of cash in payment for real property and to return the assets to Pacific States. Certificates were being used in payment on sales under court order. Odell was endeavoring to acquire 25 per cent of the outstanding certificates in order to withdraw assets. No one would bid higher on the over-all assets when the court refused to accept the 20 million dollar bid. It could not be foretold how many parcels would be bid for on the individual basis nor at what price. Odell's plan met with the approval of the attorney general's office and the court. The suggestion that upon the surrender of the certificates an entry should be made showing a debit to "interest reserve" and a credit to "contributed capital" was made by the commissioner's tax expert with the advice of the attorney general. The commis-

sioner, exercising his discretion in accordance with section 13.16a of the Building and Loan Act, had estimated the surrender value of the certificates at 100 cents on the dollar. On November 5 the court determined the surrender value to be that amount.

Plaintiffs contend that there was a conspiracy between the commissioner and the Odell interests to deprive plaintiffs of their interest rights for the unjust enrichment of Pacific States and its sole stockholder Guaranty. There is no evidence of any such conspiracy. It is obvious that the commissioner, in good faith, felt that a plan which enabled the holders to receive 100 cents on the dollar immediately, without awaiting the hazards of the future to determine whether they would receive interest in an amount which would require court action to determine, assuming that the real estate market did not change for the worse, was a fair plan. Moreover, the commissioner knew that certificates were selling on the open market for 50 to 60 cents on the dollar. Under the proposed plan the holders would now receive 100 cents on the dollar instead. Hindsight is better than foresight. Looking back we can see that the market did remain firm, even got better. But in 1945, with the boom days of the war behind, it was very doubtful as to the market's future. Many informed persons predicted a slump. Practically all steps taken by the commissioner were after consulting and upon the advice of the attorney general's office.

As conditions then existed, the plan was a fair one. Even if we conclude that it might have been better for the commissioner to refuse to countenance the plan, take chances on the future of the real estate market, the litigation, the obstructive tactics he was being met with, and to force the holders to wait and see if they could receive 100 per cent on the principal and interest, rather than to effect a fairly immediate liquidation, such conclusion is not the only reasonable one to be drawn from the then circumstances. Therefore, we cannot say, as matter of law and against the findings of the trial court, that the commissioner breached his duty in approving the plan.

3. DISCLOSURE OF FACTS BY COMMISSIONER.

This brings us to the question of whether the commissioner made a full and complete disclosure of the facts within his knowledge. Inasmuch as the bulk of the assignments were made in the period October 25, 1945-March 1, 1946, it is the acts of the commissioner at and prior to that period which are significant here. From time to time the commissioner and his

predecessors had made reports to the certificate holders of the progress of the liquidation and the financial situation of Pacific States. On January 30, 1940, the then commissioner wrote to the holders stating that he was paying a 7½ per cent dividend and gave a long recitation of the liquidation progress, the obstacles that had been overcome including Odell's objection to the payment of the dividend. It severely criticized the ''ousted Odell management.'' In blackface type it urged the holders not to sell or trade their certificates and in effect to beware of the Odell propaganda. On October 8, 1940, another letter was sent to the holders informing them that an additional 5 per cent dividend would be paid November 1. It gave the status of the litigation then pending and again in blackface type urged the holders not to part with their certificates, stating that in the then commissioner's opinion they were worth considerably more than was being offered for them. A letter dated November 1 accompanied the dividend check. Again the then commissioner advised the holders to keep their certificates, and pointed out that no one would be likely to buy their certificates unless he was sure that their actual value was considerably higher than the price offered.

On September 22, 1941, the then commissioner's letter informed the holders of the payment of another 5 per cent dividend, of the then status of the litigation, and again in blackface type urged the holders not to part with their certificates. It again stated that in the commissioner's opinion they were worth considerably more than the prices then being offered for them. On May 5, 1942, the then commissioner sent notices to the certificate holders to file proofs of claim, and in the accompanying letter pointed out that he had already paid 17½ per cent in dividends, intended to conduct an orderly liquidation of the affairs of the company, unless prevented from doing so by the litigation then pending, that there would be no wholesale disposal of the properties, those which could not be sold to advantage would be held, and that an inventory of the assets was being made and when made would be open to inspection.

On July 15, 1943, defendant commissioner sent a letter to the holders calling attention to his recent appointment as commissioner and stated that payments would have been made to them were it not for legal appeals taken by Odell which blocked the sale of assets and payments to claimants and creditors. He then called attention to the recent amendment to the Building and Loan Act which permitted withdrawal of

assets and asked the holders to express to him their preference as to one of three possible steps he could take. In italics he urged the holders not to sell or part with their claims as they were supported by substantial values. He estimated that the eventual recovery would be an additional 60 or 70 per cent which with the 17½ per cent already paid would make a total recovery of 77½ or 87½ per cent. Accompanying the letter was a statement of the status of all litigation then pending, setting forth the history of the payments on claims made to date, discussing new legislation affecting the liquidation proceedings and the financial situation of the company. It pointed out that Odell had made certain proposals to terminate the litigation if the commissioner would agree to certain things, among them being that the commissioner would not interfere with Odell's attempts to secure consents of certificate holders to reorganization or segregation of assets. The commissioner stated that the proposals did not appear to him to be in the best interests of the claimants and creditors. Included is a statement of financial condition (book values and estimated values) as of May 31, 1943. This statement shows book values of liabilities, in round numbers, of 45 million dollars with estimated values of only 34 million, a difference of over 11 million. Concerning interest, the statement set forth that accrued interest to certificate holders was not set up on the general books of the corporation. "However, the obligation to pay certificate interest for the period from March 4, 1939 to May 31, 1943, is recognized as an added liability of the company to the certificate holders and in fact has been deducted as such in Income Tax returns." The statement showed that the operation of the properties by the commissioner was now showing a net operating profit to certificate holders of 6 per cent.

On June 14, 1944, defendant commissioner sent out a letter designated "Report No. 2." This set forth the status of the litigation, discussed income taxes and reserve for contingencies, gave the result of the official poll of holders on reorganization, liquidation or segregation of assets, showing that 81.27 per cent voted for sale of assets in preference to the other steps. It stated that the commissioner intended to liquidate, showed that litigation still held up any further payments to holders, but that the commissioner hoped eventually to make substantial payments. It stated that it had come to the commissioner's attention that numerous holders had been approached to sell their claims at a discount. It

pointed out that although the commissioner could not state, with any degree of certainty, what amount would be received ultimately by claimants, it was apparent substantial additional payments would be made, and that claimants should receive considerably more through orderly liquidation than they would receive from current sales of claims to persons "now attempting to purchase such claims at their own prices." It further pointed out that a mass of misinformation and untrue propaganda was being circulated and suggested that claimants get their information from offices of the commissioner. It then stated the policy of the commissioner to the effect that there should be no repetition of the abuses theretofore suffered by the investors in Pacific States and summed up his policy in four words: "SELL ASSETS—PAY CLAIMANTS." If any equity could exist for the stockholders their interests would be protected, but the "claimants come first." Financial statements as of April 30, 1944, were then attached showing the assets as $39,172,787.50, and liabilities at the same amount. A note called attention to a figure of $3,703,641.80 as "interest accrued on investment certificates and certain other claims during the period March 4, 1939, to December 31, 1943, primarily at rates declared by the Building and Loan Commissioner . . . The payment of accrued interest is contingent upon the ultimate payment in full of all approved claims as of March 4, 1939, . . . and is subject to possible redetermination at that time." In a condensed income statement appears an item to the effect that "Interest Declared on Claims" in the sum of $1,074,696.49 had not been deducted from this condensed statement. A graphic chart was enclosed which compared the gross income and net profits under the Odell management and under state management, showing a huge increase in both under the latter management.

On September 30, 1944, defendant commissioner sent out a brief letter enclosing dividend checks bringing the total dividend paid to date to 27½ per cent. It gave a brief statement of the reduction of indebtedness and then stated that as sales of additional assets were authorized by the court and completed, further payments would be made. On March 15, 1945, Report No. 3 was made. Enclosed with it was another 10 per cent dividend, bringing the total paid to 37½ per cent. A financial statement was enclosed which the letter said showed that the claims of the holders were supported by substantial values. This statement showed assets as $32,663,-

852.96 and liabilities at the same amount. The real estate was valued at $24,921,230.71. "Accrued Interest on Claims" is shown as $4,347,670.99, with a note stating, "Contingent upon payment in full of all approved claims, interest may be paid to the extent that any available funds will permit." In reconciliation of surplus appears this item: "Add: Interest declared on claims [$]930,113.93."

On July 2, 1945, Report No. 4 was sent out. The commissioner had planned on August 1 to make a payment of 32½ per cent, but appeals from court orders authorizing sales prevented payments being made. It stated that certain proposals had been made by Odell to the commissioner which it was claimed would return to holders 100 per cent plus interest at 1 per cent, which proposals the commissioner had turned down for the reasons he set forth. The commissioner believed that under the best possible management and sale the assets would not be sufficient to pay 100 per cent to the holders, "plus earned and declared interest." He pointed out that "Claimants have first and prompt call on the proceeds of sales" and that "When and if your claim and all others are paid in full, with interest," the residue, if any, would be turned over to the sole stockholder, Guaranty. The commissioner "cannot use your claim for bargaining purposes with those who broke faith with you." The report discussed the pending litigation and Odell's obstructive tactics, and enclosed extracts from Governor Warren's veto message on a bill whose passage was urged by Odell, providing for a return from liquidation of the assets of a building and loan association under certain conditions. The report stated that the commissioner had received a bid of 20 million dollars for the assets of the company (not including $2,300,000 thereof), and that a hearing on the commissioner's petition to the court to sell all the assets to the highest bidder was set for August 21, and ended (in italics), "Let the record show that every effort is being made . . . [to] pay maximum amounts obtainable on your just claim." Enclosed were certain matters purporting to reflect on the former management of Pacific States.

Up to this point, there can be little doubt but that the commissioners, including defendant, were making fair and full disclosures of the situation of the company. They were excoriating Odell, showing that he was trying to make deals with the commissioner which in the opinion of the commissioner were not for the best interests of the holders, that most of the principal would eventually be paid the certificate holders, and

that they should receive interest, as well. The holders were strongly importuned not to dispose of their certificates. Each letter or report was apparently designed, among other things, to convince the holder that it was better for him to hold his claims than to dispose of them. Up to this point, too, the defendant commissioner had refused to consider any of Odell's propositions. ▪▪▪ But between now and his next letter, that of November 1, he agreed to accept surrender of certificates under what, for brevity, we will call the Odell plan, in which the claims for interest and principal were separated. While he stated that he would be neutral and refused to approve or disapprove the form of letter Odell intended to send out, his agreement, with full knowledge of the Odell plan, to accept the surrender of assigned certificates, constitutes an approval by him of the plan. The question of whether he performed his duty does not depend solely upon the letter of November 1, but on that letter considered together with the preceding letters and his general conduct. He had formerly warned the holders to get their information exclusively from him. There had been a substantial change in the situation. As said by the commissioner: "One of the reasons for not taking in claims was enumerated in this memorandum, that I could not give with any degree of accuracy or any degree of fairness toward all concerned an estimate of the value of certificates for surrender purposes in exchange for real estate. Between the dates that you mentioned a material change took place in the affairs of Pacific States. Through the Attorney General's office many of the large claims had been filed and rejected by the Commissioner and were in dispute; legal actions had been filed for collection of those claims and the liability set up in the balance sheet of approximately $4,500,000 had been reduced through the settlement of most of those claims, including some judgments. Therefore, the time arrived when it was possible to estimate the surrender value of the claims in exchange for real estate."

This letter is Report No. 5. It encloses a dividend of 10 per cent bringing the total payments up to 47½ per cent. It states that on October 15 a hearing was had in court on a bid to purchase the bulk of the assets for 20 million. The commissioner considered the presentation of the bid in the best interests of all creditors but made no recommendation as to its acceptance or rejection. The court denied the bid because it believed that in accordance with the appraisal the court had received the assets were worth $37,113,563. The

court also stated that in its opinion every certificate was worth 100 cents on the dollar and that the best return on the assets would be gained by disposing of them separately rather than in bulk. The court announced that 61 separate appeals would be dismissed by Odell and that he would cooperate in the matter of future sales. The commissioner then stated that such action by Odell should permit immediate closing of the sales and remove further delay in the liquidation of the assets. He assured that he was continuing in every possible way to secure the largest and speediest return to all claimants. A condensed statement of financial condition as of August 31, 1945, a profit and loss statement, and a reconciliation of surplus for the period January 1 to August 31 was enclosed. The financial statement showed total assets of $29,585,194.58 and the liabilities at the same figure. A figure of $24,911,406.88 for real estate and other assets, not including cash on hand and accounts receivable, bore the following note: "As at February 28, 1945, this group of assets with a net adjusted book value of $26,071,246.35 was appraised at $37,113,563.30 by experts appointed by the Superior Court in San Francisco." "Accrued Interest on Claims" bears this note: "Contingent upon payment in full of all approved claims, interest may be paid to the extent that any available funds will permit." In the profit and loss statement appears the item "Less: Interest on Claims $556,938.00." The statement shows a deficit of $7,116,702.53.

An executive of Wells Fargo Bank testified that on October 18 the commissioner told him for his "private personal ear" that his own carefully checked appraisal showed the assets as 5 million less than the court's appraisal. This would value the assets at in round numbers 32 million dollars as compared to the court's value of 37 million, and the commissioner's statement of values as of August 31, sent in the November 1 letter, of 29½ million. But even his appraisal showed sufficient assets to pay all creditors 100 cents on the dollar, and leave a sum for the payment of some interest. He also said that Odell's plan was feasible, bankable and safe, from the bank's standpoint.

The commissioner made monthly reports to the governor which were released to the press. The commissioner had urged holders to make inquiry concerning the company's affairs. Many inquiries were made by holders in person, by telephone and by letter. On October 29 ,the commissioner instructed his force to state to anyone making inquiry or asking for advice concerning Auxiliary's proposal to purchase certifi-

cates, that the holder should use his own sound judgment, that the commissioner had no part in the purchase and sale of claims. If the holder sold he would forfeit his right to any interest which might thereafter be realized in the liquidation over and above the full amount due on claims. Apparently, inquirers were so advised.

The November 1 letter informed the holders that the court's appraisement was 37 million; there was a note to the effect that the values in the statement were "Carried at legally prescribed values," and there was a definite statement that accrued interest was carried as a liability with a note to the effect that its payment was "contingent upon payment in full of all approved claims . . . ."

Plaintiffs claim that in the letter of November 1 the commissioner omitted various matters which should have been included. In considering these alleged omissions, the purpose of the letter must be borne in mind. Two reports had been made to the holders already that year. Now in addition to sending a dividend, the commissioner desired to report the situation as disclosed in the court hearing on the 20 million dollar bid, and the fact that through the now cooperation of Odell there would be no further delay in the making of sales and the liquidation of assets, and to assure the holders that he would endeavor in every possible way to secure for them the largest returns. This letter, following the plan of his previous letters, contained a statement of assets at "legally prescribed values" and showed in comparison with the other reports an increase in assets and a decrease in liabilities. Plaintiffs complain that he did not tell the rate of interest set up on the books, the fact that he would pay such interest as might be determined by the courts, which might even be 7 per cent. All of the letters, including that of November 1, showed plainly that the commissioner intended to pay interest, if the return from the sales of assets warranted it. The amount of that interest would be for further determination. The trustee violated no duty in not stating at that particular time what amount of interest he had in mind. The holders knew when they sold their certificates that they were terminating their right to interest, at whatever rate that interest might be. Had they been concerned with the rate they could have asked the trustee and then it would have been his duty to inform them fully as to his position on the rate of interest.

Plaintiffs contend that he did not tell them that assets of Pacific States were being or to be used in buying

claims. This is a rather specious claim based upon the fact that the bids in court for the purchase of a particular piece of property were made on a cash basis, and that when the bid was confirmed, the bidder was asked by Odell to pay in certificates. The bidder's cash, the certificates necessary in amount to equal that cash, which had been purchased by the Robert S. Odell Company on money borrowed from a bank with the certificates pledged as collateral, were all placed in escrow. When the commissioner's deed was received by the escrow holder, the latter would deliver it to the purchaser, the certificates to the commissioner for surrender, the purchase money would then be paid to the bank in payment of the loan with which the certificates had been purchased. To say that the assets of Pacific States were being used to purchase claims is a fallacy. The claims were purchased by the bank loans. All the commissioner was doing was accepting certificates in payment of assets as he had a legal right to do.

*Viner* v. *Untrecht,* 26 Cal.2d 261 [158 P.2d 3], cited by plaintiffs, would be in point only were plaintiffs' contention that the commissioner was really buying claims for Auxiliary with Pacific States assets well founded, which it is not. The other authorities cited by plaintiffs deal with situations in which the trustee was dealing with the beneficiary in such manner as to obtain an advantage for himself, and hence do not apply to the situation here.

█ The commissioner in this letter took what he referred to in letters written to inquirers as a "neutral attitude" as regards the purchase by Auxiliary of certificates. We have been cited to no case which holds where as here he was a trustee as to both certificate holders and stockholders, although the holders had superior rights to the latter, he was required as a matter of law to advise the one as against the other in dealings between themselves or to take other than a neutral position in that respect. His duty was to disclose all necessary facts but not necessarily to advise.

█ His statement to inquirers that he had no part in the purchase or sale of claims was true, and so found by the court. He had agreed to accept certificates in purchase of property, and that agreement was necessary before the banks would loan Auxiliary money with which to buy certificates. But he was not engaged in the buying or selling of certificates. Without his agreement, the entire Odell plan would fall. However, he was not buying certificates, any more than in the usual

case of a commissioner agreeing to accept certificates at face value in the purchase of property.

In view of the fact that the appraisal of the commissioner which he mentioned to the Wells Fargo banker was less than the court's appraisal of 37 million, the fact that in the letter of November 1 the commissioner stated he was ''continuing in every possible way to secure the largest and speediest return to all claimants,'' and in view of the language contained in the previous letters, we cannot say as matter of law that he was withholding information. The situation as to interest is well expressed in the words of the commissioner's tax expert: ''In my opinion this right to receive interest is so contingent, not only because of the contingency as to realization of sufficient money from the liquidation of the assets of the company to provide for a surplus after payment of the principal amount of all obligations, but also because of controversy and doubt as to the proper rate of interest to be paid, that it has no present fair market value. The contribution of this contingent interest right to Pacific States does not result in present income to State Guaranty although as previously indicated it might result in income to State Guaranty Corporation upon ultimate liquidation and dissolution of Pacific States Savings.''

To uphold plaintiffs' contention would mean that every time a trustee in reorganization sent out a letter to the creditors he would have to recapitulate all facts theretofore reported by him, together with all estimates and facts within his knowledge, under penalty of being declared to have violated his trust. The commissioner here substantially complied with his obligations. Looking back, it would have been better for him to have set forth in his November 1 letter the matters he set forth in the February 28, 1946, letter, but we cannot hold that he violated his trust for failure to write a particular kind of letter. Plaintiffs cannot deny that they knew that in accepting 100 cents on the dollar they were foreclosing themselves from thereafter obtaining interest, or that the commissioner was claiming that interest would be payable on certificates if the sales of property would bring sufficient returns. The assignments of their claims which the plaintiffs signed stated that the holder was assigning to Auxiliary his certificate ''together with all amounts (including interest, if any, which might become legally payable thereon after the principal amounts of all approved claims shall have been paid in full) which may be or become due thereunder. . . .''

### 4. ACTIONS OF AUXILIARY AND GUARANTY.

There was no fiduciary relationship between the certificate holders and Pacific States' sole stockholder Auxiliary or Guaranty, even though, after insolvency, they were fellow beneficiaries. Investment certificate holders, by the Building and Loan Act, were not liable for debts or assessments, nor could they participate in profits or dividends. Upon liquidation they must receive payment in full before any payment or distribution could be made to shareholders or stockholders. Plaintiffs cite no case holding that the relationship between the investor and the stockholder in a building and loan association is of a fiduciary nature, and assuming, as contended by plaintiffs, that there was an implied contract between the corporate defendants and plaintiffs that they would do nothing which would wrongfully deprive claimants of their rights, there was no violation of such contract. At all times the Odell group were dealing at arm's length with the certificate holders. They were, at all times, as the certificate holders well knew, attacking the seizure of the company by the commissioner and trying to get its assets back into their possession and control. Time after time the commissioner had warned the holders to beware of them, and even sent the holders certain matters charging the Odell group with mistreating certificate holders during their management of the company.

### 5. FINDINGS.

Plaintiffs contend that a large number of the findings are not supported by the evidence. As to many of the findings plaintiffs' contention is based upon a different interpretation of the facts than that given by the court. For example, in findings two and three the court found that plaintiffs and their class did not own claims after they had made the assignments to Auxiliary. As the court held the assignments valid this result necessarily follows. It is not necessary to consider the other findings that are in this class, as we have determined that the facts justified the court in concluding that the assignments were valid and there was no fraud. Again plaintiffs erroneously contend that the commissioner paid for claims through Auxiliary, which they claim was his agent. Findings to the contrary on that and allied subjects were correct.

There were several findings which were not justified by the evidence. However, they would not affect the decision in the case. They are: (1) It was not the intention of the commissioner and other defendants that the claims assigned to

Auxiliary were to be delivered to the commissioner for cancellation. That was the purpose of the plan to which the commissioner agreed. (2) That the commissioner did not believe that all claimants would be entitled to interest, if there was an overplus from the sale of assets after paying all claims. The commissioner at all times believed that claimants would be entitled to such interest as the court might allow. (3) The court found that the commissioner told plaintiffs, before the making of the assignments, that he had assets of a value sufficient to enable him in due course of liquidation to pay all creditors in full, plus some interest. Actually the commissioner, as heretofore shown, did not make such a statement. (4) The court found, in effect, that the commissioner determined the rate of interest payable to claimants and the manner of compilation thereof. The commissioner used a certain rate for income purposes only and intended that the rate should be determined by the court, if and when there were assets from which to pay interest.

In view of our decision, it becomes unnecessary to discuss the questions raised by plaintiffs concerning the admissibility of certain evidence.

6. INTEREST AND THE APRIL 8, 1946, AGREEMENT.

In view of the fact that by their assignments, plaintiffs parted with all claims against Pacific States, they would not be entitled to interest, no matter what the rate might be, nor could they be concerned with the validity or invalidity of the agreement of April 8, 1946. Hence, it is unnecessary to discuss these matters.

The judgment is affirmed.

Peters, P. J., and Ward, J., concurred.

A petition for a rehearing was denied December 6, 1949. The opinion was modified to read as above on December 7, 1949. Appellants' petition for a hearing by the Supreme Court was denied January 4, 1950. Carter, J., voted for a hearing.