[Civ. No. 14146.   First Dist., Div. One.   May 16, 1950.]

JOSEPH T. STANLEY, Respondent, v. ROBERT S. ODELL AND COMPANY et al., Defendants; PACIFIC STATES SAVINGS AND LOAN COMPANY, Appellant.

522

Raymond B. Haizlip for Appellant.

Lawrence Livingston, H. W. S. Leeker, Jesse Feldman and Dudley Harkleroad for Respondent.

PETERS, P. J.—Joseph T. Stanley brought an action for $10,000 for money had and received against Robert S. Odell and Company, Robert S. Odell, Pacific States Savings and Loan Company, State Guaranty Corporation, Pacific States Auxiliary Corporation, Frank C. Mortimer and Frank C. Mortimer as Building and Loan Commissioner. Pacific States Savings and Loan Company cross-complained against Stanley and one Miller, agent of Stanley, to recover possession and to quiet its title to $10,000 in Pacific States investment certificates.

Stanley claimed these certificates as his own. Mortimer, individually and as commissioner, was dismissed as a defendant. Miller, who had physical possession of the certificates, deposited them in court and was dismissed as a cross-defendant. The trial court held against Stanley on his complaint, and no appeal is taken from that portion of the judgment. The trial court decided in favor of Stanley on the issues presented by the cross-complaint and quieted his title to the certificates. From these portions of the judgment Robert S. Odell and Company, Robert S. Odell, State Guaranty Corporation and Pacific States Auxiliary Corporation, as well as Pacific States Savings and Loan Company appeal. The first four named were not parties to the cross-complaint. They were in the case solely as defendants named in the money had and received action filed by Stanley. The issues presented in that action were decided in their favor, and no appeal is taken from that portion of the judgment. Not being parties to the cross-complaint, they have no right to appeal from the portions of the judgment disposing of the issues solely presented by the cross-complaint. Pacific States Savings and Loan Company and Stanley, so far as the issues presented by the pleadings are concerned, are the sole claimants to the certificates. This being so, the purported appeals by Robert S. Odell and Company, Robert S. Odell, State Guaranty Corporation and Pacific States Auxiliary Corporation must be dismissed.

This case presents another facet in the litigation resulting from the seizure by the Building and Loan Commissioner of the assets and properties of Pacific States on March 4, 1939. Pacific States, as permitted by law, resisted the seizure. Its validity was upheld by the trial court and by the California Supreme Court, the date of the Supreme Court decision being January 31, 1945. (*Pacific States Sav. & L. Co.* v. *Hise*, 25 Cal.2d 822 [155 P.2d 809, 158 A.L.R. 955].) While this case was pending and still undecided, and thereafter, the commissioner, pursuant to his statutory power to liquidate, took bids on various properties owned by Pacific States, and, where he thought the bid was adequate, sought court approval of the proposed sale. Odell, who was the moving and controlling spirit in all of the corporations above named, appeared in one of his various capacities at such court hearings, and, whenever he believed the bid to be too low, would protest the confirmation and challenge the validity of the proposed sale on constitutional grounds. He would

then appeal from the order of confirmation. The present controversy grew out of just such a transaction.

Stanley had been engaged in the furniture business at 719 Mission Street, San Francisco, for over 20 years. His lease on those premises expired on December 1, 1944, and he knew that he would have to move from those premises on that date as early as July of that year. He made arrangements to rent the premises at 725 Mission Street, but the best deal he could get at that location was a month-to-month tenancy. He was most anxious to secure a permanent location in the immediate neighborhood. The only building available for his purposes was 739 Mission Street, then owned by Pacific States.

Miller, a real estate broker, interested Stanley in the property at 739 Mission Street. On October 26, 1944, Stanley made a bid, in open court, of $86,500 cash for this property. This bid was withdrawn when the court announced that it would not accept bids on the property on that date. At that hearing Odell told Livingston, Stanley's attorney, that: "Before we let you get away with that and get that property at any such price we'll keep you in court for five years." Livingston repeated this conversation to his client. Thereafter, Stanley submitted a formal bid to the commissioner of $85,000, and, after the commissioner sought but was unable to secure a higher bid, the commissioner, on November 20, 1944, accepted that bid and petitioned the court for approval of the sale. The trial court had had its own appraisals of the Pacific States properties made, and on the date here involved had two appraisals of the Mission Street property, one for $90,000 and one for $100,000. The trial judge refused to accept the $85,000 bid, and stated that he would not approve a sale at less than $95,000, the average of the two appraisals. Stanley thereupon, in open court, bid $95,000 cash for the property, which bid the court approved. The court, thereupon, made its order authorizing the commissioner to sell the property to Stanley at the bid price. Gardiner Johnson, attorney for Pacific States, and for some of the other defendants named in the complaint, orally objected to the sale, placing his objections entirely on constitutional grounds. No objection that a higher bid was available, or that the proper procedure had not been followed, was made. At this time—November 20, 1944—the Hise case was still undecided by the Supreme Court, the District Court of Appeal by a divided court had reversed the order of seizure,

and, although the Supreme Court had granted a hearing, the validity of the seizure was still in doubt.

After the court order authorizing the sale had been made, and on the same day, the commissioner and Stanley executed a deposit receipt, which was, in effect, a contract of sale. The document acknowledged receipt of 10 per cent of the purchase price, and provided for the opening of an escrow. The escrow was to last 30 to 60 days and would then be terminated if the seller was unable to convey insurable title within that time, and within any extensions that might be granted by the buyer. While this escrow was still open, and on January 5, 1945, Pacific States appealed from the court order authorizing the sale. Because of this appeal, Stanley agreed with the commissioner that the escrow would remain open pending the determination of the appeal and for 30 days thereafter, if the appeal were determined in the commissioner's favor.

This appeal was one of 62 such appeals filed by Pacific States. None of these appeals was ever completed by Pacific States by the filing of the transcripts or by paying the filing fees. In the instant case, Livingston, on behalf of Stanley, had the transcripts prepared. The attorney for Pacific States failed to file any brief in this case or in any of the other 61 cases. Livingston tried to expedite the appeal and wrote to the appellate court objecting to any further extensions, but no brief was filed. Finally, in September of 1945, the attorney-general, on behalf of the commissioner, moved to dismiss all of the appeals on the ground that the appeals were frivolous, in that all constitutional questions had been decided adversely to Pacific States in the Hise case, and only such questions were presented on the appeals. The appellate court denied the motion to dismiss on the ground that it could not determine whether the appeals were frivolous without examining the records, which were not yet before it. Pacific States was relieved of its default ''on condition that all transcripts on appeal be filed herein without further delay.'' (*Pacific States Sav. & L. Co.* v. *Mortimer*, 70 Cal. App.2d 811, 816 [161 P.2d 684].) The transcripts were never filed, nor were the filing fees paid. The appeal in the Stanley case involving the Mission Street property was voluntarily dismissed on September 12, 1945, under circumstances to be discussed later. In the instant case the trial court found that the appeal was taken for delay and that such dismissal was of no value to Stanley.

After the commissioner, on November 20, 1944, had entered into the contract to sell the Mission Street property to Stanley for $95,000, he received from one Callan an offer to purchase for $107,000. The Callan offer, by its terms, expired January 15, 1945, and on the 16th the commissioner returned the deposit made by Callan, for the reason that he had been advised that the existing agreement with Stanley could not be set aside except with Stanley's consent.

As already pointed out, in November, 1944, Stanley knew that he had to get out of 719 Mission Street on December 1, 1944, and that his tenancy at 725 Mission Street was simply a month-to-month tenancy. He was most anxious to remodel and to move into 739 Mission Street. When the appeal was filed challenging his contract with the commissioner, title insurance could not be secured. Faced with this situation, Stanley negotiated a lease with the commissioner of 739 Mission Street for a two-year period commencing July 1, 1945. The commissioner had been advised that two years was the longest he could lease such properties. Thus, the commissioner attempted to cooperate with Stanley so that he would be able to continue in business pending the appeal. Stanley took possession of the premises in July of 1945, and, after some rather extensive remodelling, opened for business at 739 Mission Street in September of 1945.

Early in 1945, Stanley had a conversation with one Raffeto, salesman-manager in charge of the Pacific States properties held by the commissioner, but whose salary was apparently paid by Pacific States, Stanley asking Raffeto what he had to do to get title to the property. Raffeto told Stanley about the Callan bid and also told him, erroneously, that the commissioner was not bound by his agreement with Stanley and might re-petition the court. Raffeto therefore told Stanley, "Now, if you can meet this price maybe you can get quitclaim deeds from Odell, I don't know."

Also during these early months of 1945, Stanley frequently consulted with his agent Miller. During these conferences Miller, whose good faith is not questioned, gave Stanley some unsound and incorrect advice. Among other things, Miller told Stanley that he had to have a quitclaim deed from Odell before he could get title insurance. Miller told this to Stanley even though the commissioner's office had told him that Stanley was entitled to title insurance without a quitclaim. The fact was that, prior to January 31, 1945, when the Hise case was decided, the title companies required quitclaims before

issuing title insurance because the very question involved in that action was the validity of the commissioner's possession. But after that case was decided, some of the title companies at least no longer required quitclaims from Pacific States as a condition to issuing title insurance.

Under these circumstances, Stanley asked Miller to arrange a conference with Odell to see if a deal could be worked out. Such conferences were held in June, July and August of 1945. Stanley failed to consult his attorney about these conferences and failed to tell him anything about what occurred. At one of these conferences Odell told Stanley that he could not possibly let him have the property unless Stanley agreed to pay another $10,000, and he further told Stanley that he, Odell, would keep Stanley in court for five years if necessary before he would agree to a $95,000 sale. He told Stanley: "You have an expensive attorney. It will cost you $10,000 anyway. You might just as well pay it to me." Finally, Stanley authorized Miller to find out just what Odell wanted. Odell told Miller that: "You will have to buy $10,000 worth of [investment] certificates [in Pacific States], turn them into the Pacific States Savings and Loan Company, and I will give you quitclaim deeds and dismiss my court action." Odell also told Miller that these certificates would have to be bought from the Robert S. Odell and Company. Stanley agreed to the proposition, and wrote out a check for $10,000 to Robert S. Odell and Company and delivered it to Miller. Miller gave the check to Odell, who gave Miller $10,000 in certificates and quitclaim deeds. All of this occurred on August 10, 1945, and took place without the knowledge of Stanley's attorney.

Odell had orally instructed Miller to deliver the $10,000 in certificates to the commissioner to be added to the $95,000 purchase price. Miller promised to do this and kept his word. He immediately took the certificates to Colonel F. M. Smith, Deputy Building and Loan Commissioner in charge of the liquidation of Pacific States. Colonel Smith refused to accept the certificates. He testified that he refused them on the grounds that he thought the certificates tendered were subject to a lien, were under the supervision of the sheriff, and because he thought the price bid was a fair one, that the court had authorized the sale at $95,000, and he did not feel that the commissioner had any right to any sum in excess of $95,000 without orders from the court.

Miller immediately reported the incident to Odell who told

him to keep the certificates until he received further instructions. Odell made no demand for a return of the quitclaim deeds, and, in fact, a short time later his attorney prepared and delivered to Stanley a dismissal of the pending appeal. This dismissal was filed with the appellate court on September 12, 1945, together with a stipulation that the remittitur could issue forthwith.

In September, 1945, Odell called Miller and told him that he wanted to make a formal tender of the certificates to the commissioner, and instructed Miller to get in touch with Johnson, Odell's attorney. This, Miller did, and Johnson gave him a letter to be signed by Stanley and addressed to the commissioner. This letter is dated September 13, 1945, and was signed by Stanley. Miller and Johnson then presented this letter, together with another of the same date signed by Johnson, to the commissioner, formally tendering the certificates to him and explaining the purpose of the tender. The Stanley letter, after briefly reviewing the facts relating to the sale, and after stating that quitclaim deeds from State Guaranty and Pacific States had already been deposited in escrow, contains the following pertinent paragraph: "In order to obtain the quitclaim deeds from Pacific States Savings and Loan Company and State Guaranty Corporation the purchaser, Joseph T. Stanley, agreed to deposit in addition to the sum of $95,000.00 net cash an additional amount to be made up of $10,000.00 original face value of Pacific States Savings and Loan Company certificates. It was agreed with the officers of Pacific States and State Guaranty Corporation that the full amount of the certificates would be delivered to you at the time the sale was consummated as additional consideration for the purchase, it being understood that the entire amount would be retained by you for the benefit of the investors in Pacific States." The letter then made a formal tender of the certificates and requested a receipt for them.

The Johnson letter first states that Johnson had seen the Stanley letter and then continued as follows:

"This is to inform you that Pacific States Savings and Loan Company and State Guaranty Corporation are in agreement with the statements contained in that letter. The condition of the delivery of the quitclaim deeds from Pacific States and State Guaranty Corporation was that $10,000.00 original face value of Pacific States certificates would be delivered to you in addition to the sum of $95,000.00 net cash,

and the full amount thereof to be retained by you for the benefit of the investors in Pacific States.

"So that you may be fully informed there was never any understanding that any portion of the certificates referred to would be retained by Pacific States, State Guaranty Corporation or any officer or director of either corporation.

"This letter is to serve as a demand that you proceed to accept this additional amount which is for the benefit of the investors in Pacific States. Should you refuse to do so action will be taken to enforce liability against you personally for any loss that may be incurred."

Both letters were delivered by Johnson and Miller to Colonel Smith, the certificates were again tendered, and the colonel refused to accept the tender, telling Johnson and Miller that he had been advised by the attorney-general's office that he had no legal right to take the certificates. Without objection from Odell or his counsel, Miller retained physical possession of the certificates until the time of trial, when he deposited them with the court and was dismissed as a party.

On April 2, 1946, Stanley sold the building involved to a third party for $117,000, and leased back a portion of it for his business. He testified that the amount received—$117,000 —just about equalled the purchase price—$95,000—plus what he had spent for improvements.

Another date that must be mentioned is April 22, 1946— the date the commissioner transferred back to Pacific States all of the assets of the company remaining in his hands.

The trial court first determined that Stanley should not recover on his claim and delivery action, and then found the facts substantially as above set forth. It found that the contract whereby Stanley agreed to tender the certificates to the commissioner was made with Odell; that the appeal taken by Pacific States in reference to this sale "was taken for purposes of delay"; that Pacific States never was and is not now the owner of the certificates; that the certificates belong to Stanley, and that he is the owner thereof. The court expressly found that the "quitclaim deeds were of no value and that the dismissal of said appeal was no consideration and that said deeds and said dismissal were so inadequate as consideration that they did not and do not justify depriving [Stanley] . . . of any interest in said certificates."

The basic question to be determined on this appeal is, who owned the certificates after the commissioner rejected the

tender—Pacific States or Stanley? The parties differ widely as to the legal nature of the transaction, and the results that follow therefrom. They disagree over who were the contracting parties, what rights Pacific States and its officers had during the period of seizure, and over practically every important finding of the trial court.

Whatever the precise nature of the legal relations of the parties may have been, the actual fact is that while the commissioner was lawfully in possession of the assets of Pacific States and had title thereto, and after the validity of his possession and title had been determined, and while the commissioner, pursuant to his statutory duty was liquidating that company, Odell, claiming to act on behalf of Pacific States or one of the related companies, was purporting to act for that company and attempting to delay or prevent liquidation. Odell was deliberately trying to impede the orderly liquidation of Pacific States by raising the price of property after the commissioner and the court had approved a fixed price as provided by law. Odell assumed to deal with purchasers and proposed purchasers as if he were authorized to make the liquidating transactions, or as if he were entitled to participate in the negotiations. The statute under which the commissioner was proceeding contemplates that when a building and loan association has been properly seized (and that had been judicially determined here by January 31, 1945), and the commissioner proceeds to liquidate under court supervision, the commissioner, for purposes of liquidation is the corporation and exercises, for that purpose, the place of the officers and board of directors of the seized company. While the old management may challenge the seizure and has power to challenge sales as inadequate, once the court and commissioner have approved a sale, the old management has no legal power to interfere with the completion of that sale, except perhaps to urge that a higher bid was made or the proper procedure was not followed—contentions not made as to the present sale. The actions of Odell in the present case can only be interpreted as an attempt by him to circumvent the statute which authorizes the commissioner to regulate, manage and liquidate associations which he has been forced to take over because of the improper or unlawful actions of the old management. Action such as was taken by Odell in the instant case would necessarily tend to discourage bidders from making fair offers for the liquidated property, because such bidders would know that, although their bid was accepted by

the commissioner and by the court, they would either be held up for further amounts by the old management, or they would be harassed for years in the courts. It seems too clear to require further comment that such tactics, as a matter of law, violated fundamental principles of public policy. Pacific States, acting through Odell, should not be permitted to enforce any rights at law or in equity, based upon such a fundamental violation of public policy.

Title to the certificates when this action was commenced was in Stanley. The "courts will not compel parties to perform contracts which have for their object the performance of acts against sound public policy either by decreeing specific performance or awarding damages for breach." (*Haruko Takeuchi* v. *Schmuck,* 206 Cal. 782, 786 [276 P. 345].) "Ordinarily the parties to a contract, void because contrary to public policy, will be left where they are, when they come to the court for relief." (*Brooks* v. *Brooks,* 63 Cal.App.2d 671, 676 [147 P.2d 417].)

These principles are elementary. On this ground alone the judgment appealed from could be affirmed. But it is not necessary to base our conclusion on this ground alone. Even if this public policy argument be disregarded, the same result follows. The trial court found that the contract involved was between Stanley and Odell. The Pacific States was not one of the contracting parties. The record supports this finding. The only other finding possible under the evidence would have been that Robert S. Odell and Company, since the certificates were purchased from it, was a contracting party. But that company is not involved on this appeal. The litigants before the court are Stanley and Pacific States. Neither Odell, nor any other company named in the complaint except Pacific States, has claimed, or in this proceeding can claim, the certificates. They are not parties to this appeal. Stanley paid $10,000 for $10,000 worth of certificates. Stanley agreed to tender delivery of such certificates to Pacific States. At that time Pacific States was in liquidation, so that, for purposes of liquidation, the commissioner represented Pacific States. Acting on behalf of Pacific States, the commissioner renounced any claim to the certificates. At that time the commissioner was legally entitled to manage and control Pacific States. His disclaimer was a disclaimer by Pacific States to the same extent as a formal disclaimer by the board of directors of a non-seized company would have been. Thus, the legal

situation is relatively simple. Before the court are two parties —Stanley and Pacific States. Stanley has title to $10,000 worth of certificates, and has paid $10,000 for them. The other party —Pacific States—has formally and legally disclaimed any interest in the certificates. Under such circumstances, it necessarily follows that Pacific States has no interest in the certificates.

It cannot be logically contended that Stanley did not perform his contract with Odell. The contract between Stanley and Odell or Odell Company was simply that Stanley would pay $10,000 for $10,000 worth of certificates, Odell would deliver quitclaims and a dismissal, and Stanley would tender the certificates to the commissioner. There was no agreement, express or implied, that the transaction would be rescinded if the commissioner failed to accept the certificates. This is demonstrated by what the parties did, and by the realities of the situation. Stanley purchased the certificates on August 10, 1945, and on the same day Odell delivered to Stanley the quitclaim deeds. The commissioner refused to accept the certificates that day and this fact was immediately communicated to Odell, who told Miller to keep the certificates until he received further instructions. After the rejection by the commissioner, and after Odell knew of the rejection, on September 12, 1945, Pacific States dismissed the pending appeal. On September 13, 1945, Miller, acting for Stanley and on instructions of the attorney for Odell and Pacific States, made a formal tender of the certificates to the commissioner, and the attorney for Pacific States and Odell threatened the commissioner with legal proceedings if he refused the tender. This demonstrates to a certainty that the transaction between Odell and Stanley was not conditioned on the acceptance of the certificates by the commissioner, otherwise why would the dismissal of the appeal have been furnished when Odell knew that the commissioner had refused to accept the certificates, and why would he have furnished the quitclaim deeds before he had received his *quid pro quo*? The only reasonable interpretation of the evidence is that Odell, or the companies he represented, had already received their profit by selling Stanley investment certificates at their face value. While there is no evidence as to how much Odell and Company, or any other connected company paid for the certificates, we know from the other litigation involving this company that many such certificates were purchased by Odell, or the companies he represents, at fifty to sixty cents on the

dollar. (See *Zottarelli* v. *Pacific States Sav. & Loan Co.*, 94 Cal.App.2d 480, 486, 491-492 [211 P.2d 23].) It must be remembered that Pacific States does not wish to rescind by tendering back $10,000 to Stanley, but simply wants Odell and Company to keep the $10,000 and to quiet its title to the certificates. Under the circumstances, such relief cannot be granted.

Pacific States analyzes the legal situation quite differently. It contends that Stanley was a debtor of Pacific States, and that as a debtor he tendered the certificates to the creditor, the commissioner. Based on these erroneous premises it urges that when a debtor tenders property to a creditor and signifies his intention of passing title, title passes to the creditor, and the debtor thereafter holds the property as bailee for the creditor. This being so, the argument continues, when the commissioner in 1946 assigned all the property he then owned of Pacific States back to that company, title to the certificates passed. If the premises were sound, the conclusion would be correct (Civ. Code, § 1502; *Lamott* v. *Butler*, 18 Cal. 32), but the trouble with the argument is that it is based on erroneous premises. The contract was between Odell and Stanley. Pacific States was not a party. Stanley owed Pacific States a total of $95,000 and no more. Pacific States was not a creditor of Stanley's as to the obligation involved on the present transaction. In apparent recognition of this logical and practical difficulty, Pacific States argues that the commissioner was a third party beneficiary of the contract between Stanley and Odell, was therefore a party to the contract, and, as such, could either have sued Stanley on his promise to Odell, or could have assigned his rights to an assignee. Pacific States claims to be such an assignee, and claims the right to sue on the contract as long as the Stanley-Odell contract remains unrescinded.

If the commissioner was a third party beneficiary of the Stanley-Odell agreement, he was a donee beneficiary, as no obligation in reference to the certificates existed between Stanley and the commissioner. The mere execution of a contract between A and B for the benefit of C as a donee beneficiary, does not give C any right to enforce such an agreement after C has rejected any rights under the contract made for his benefit. If the commissioner was a third party donee beneficiary, his disclaimer terminated any rights he may have had thereunder. This elementary principle is stated as follows in the Restatement of Contracts, section 137: "A

534

donee beneficiary or a creditor beneficiary who has not previously assented to the promise for his benefit, may, in a reasonable time after learning of its existence and terms, render the duty to himself inoperative from the beginning by disclaimer, unless such action is a fraud on creditors." In "Comment: a" under this section it is stated: "The beneficiary, however, even though he change his mind after disclaiming, will have no right of his own." In the California annotations to section 137 appears the following: "Proposition stated seems sufficient without citation of authority. That the recipient of a gift may disclaim and refuse to receive it is elementary. Since, in California, the promise to the promisee is deemed a mere offer to the beneficiary, it seems clear that he may affirmatively reject such offer by disclaimer, as well as by mere failure to accept."

As already pointed out, when the commissioner refused to accept the certificates he was acting, so far as liquidation is concerned, as the officer in full charge of such liquidation with full power to represent Pacific States. As commissioner, he disclaimed any rights of Pacific States to the certificates. The rejection of an offer kills the offer. California, as pointed out above, regards the promise made to perform for the benefit of a donee beneficiary as an offer to him. Where an offer has been rejected it cannot be accepted later by either the offeree or his assignee. (1 Williston on Contracts (rev. ed.), p. 144, § 51; *Niles* v. *Hancock*, 140 Cal. 157 [73 P. 840].) Thus, if Pacific States is correct in its analysis that the commissioner was a third party beneficiary of the Stanley-Odell contract, his disclaimer terminated his rights, and all rights of future assignees.

Stanley points out that the facts probably do not disclose a third party beneficiary situation at all, but that what is probably involved is that the commissioner was the beneficiary of a trust created by the Stanley-Odell agreement. Under this theory, either Odell (or Odell and Company) or Stanley was the settlor. If Stanley owned the certificates and promised to deliver them to the commissioner, the disclaimer by the commissioner necessarily terminated any rights of the commissioner and title remained in Stanley. This seems elementary. The principle is thus stated in section 36d of the Restatement of Trusts: "If the owner of property [Stanley] declares himself trustee and the beneficiary [the commissioner] disclaims, the owner [Stanley] thereupon holds the property free of trust."

■ On the other hand, if Odell or Odell and Company was the settlor and Stanley was the trustee, the same result follows. Section 423 of the Restatement of Trusts reads as follows: ''Where the owner of property [assumed to be Odell or Odell and Company] transfers it upon a trust which fails, and he receives from the transferee [Stanley] consideration for the transfer as an agreed exchange, there is no resulting trust, and the transferee holds the property free of trust.'' (See, also, 3 Scott on Trusts, p. 2205, § 423; 2 Bogert on Trusts and Trustees, p. 1276, § 418.)

Thus it appears that whether this case be approached from the standpoint of public policy, or from an analysis of the legal relations of the parties, an affirmance is compelled. Legally, the two facts that Stanley paid full value for the certificates, and that the commissioner legally and properly disclaimed any right to the certificates prohibit any recovery by Pacific States.

■ Pacific States complains of the finding that the quitclaim deeds were of no value, and that the dismissal of the appeal was no consideration. The finding is in accordance with the true facts. While Odell was successful in convincing Stanley that he needed the deeds and the dismissal, such was not the true fact. This case is an equitable one. The trial court, in such an action, is required to determine the true value of the deeds and dismissal—not their assumed value. Odell received full value for the certificates—$10,000 for $10,000 in certificates. It must be remembered that during liquidation, title to the property was not in Pacific States, Odell, or Odell and Company, but in the commissioner. The Building & Loan Association Act (Deering's Gen. Laws, Act 986, § 13.16) gives the commissioner power, on court order ''to sell, convey or transfer real or personal property,'' and power to execute the necessary deeds. The same section specifically provides that ''any deed . . . or other instrument executed pursuant to the authority hereby given shall be valid and effectual for all purposes as though the same had been executed by the officers of such association by authority of its board of directors.'' While the Hise case was pending, no title company would issue title insurance without a quitclaim from Pacific States. But there is substantial evidence that after that case had been decided (January 31, 1945), such deeds were not required as a condition of title insurance. Although Odell convinced Stanley that the deeds were necessary, this, in actual fact, was not true.

Nor was the dismissal of the appeal of any real value to Stanley. The trial court found that the dismissal and quit-claims "were so inadequate as consideration that they did not and do not justify depriving plaintiff . . . of any interest in said certificates." There can be no doubt that when the appeal was taken from the order authorizing the sale, it was taken in good faith. At that time (January 5, 1945), Pacific States was contesting the validity of the seizure. If the seizure were upset, then pending sales by the commissioner would be upset. The objections to the sale made in open court were not that a higher bid was available, or that the proper procedure had not been followed, but that Pacific States was being deprived of its property without due process. Once the Supreme Court had determined the Hise case (which it did on January 31, 1945), the constitutional arguments were all disposed of. The tactics thereafter employed by Pacific States in the appeal from the order authorizing the sale of the Mission Street property for $95,000, and in the other 61 appeals in similar cases, support the finding that such appeals were taken simply for delay. The evidence shows threats by Odell to keep the case in court for five years. Not one brief was ever filed by Pacific States in the appellate court on these cases, nor was one transcript ever filed there in any of the appeals. The dismissal of groundless litigation is, of course, no consideration. The trial court was certainly justified in finding that the appeal was taken for delay and was inadequate consideration to support Pacific States' claim to quiet its title to the certificates.

The other contentions of Pacific States are so insubstantial as not to require further comment.

The appeals of Robert S. Odell, Robert S. Odell and Company, State Guaranty Corporation, and Pacific States Auxiliary Corporation are dismissed. On the appeal of Pacific States Savings and Loan Company, the judgment is affirmed.

Bray, J., and Schottky, J. pro tem., concurred.

A petition for a rehearing was denied June 15, 1950, and appellant's petition for a hearing by the Supreme Court was denied July 13, 1950. Schauer, J., voted for a hearing.